**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **LOUIS RIDGEWAY,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO.** |
| | : | **3:11-cv-976 (VLB)** |
| | : | |
| **ROYAL BANK OF SCOTLAND GROUP and** | : | |
| **RBS GLOBAL BANKING AND MARKETS,** | : | |
| **Defendants.** | : | **March 26, 2012** |

**MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION TO DISMISS [Doc. #18]**

Plaintiff Louis Ridgeway (Ridgeway) brings this action for damages against the Defendant Royal Bank of Scotland Group (RBS) relating to his termination from RBS on April 22, 2010, while on leave for medical treatment. Ridgeway alleges that RBS violated the Family and Medical Leave Act, 29 U.S.C. §2601 *et seq.* (FMLA) and the Connecticut Family and Medical Leave Act (CTFMLA), Conn. Gen Stat. §31-51kk et seq.  Additionally, Ridgeway asserts claims of wrongful termination, promissory estoppel, and negligent misrepresentation under Connecticut common law.

Currently pending before the Court is a motion to dismiss all claims for relief for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6) and D. Conn. L. Civ. P. Rule 7(a).   Further, the Defendant seeks legal fees and costs pertaining to Ridgeway's third claim brought under the CTFMLA asserting that Ridgeway lacked substantial justification for bringing this claim.

1

I.      Factual Background

RBS is a multinational bank headquartered in Edinburgh, Scotland with its United States corporate headquarters located in Stamford, Connecticut. [Dkt #1, Compl., ¶¶12-13].  Ridgeway, a New Jersey resident, was employed by ABN AMRO between November 2001 and November 2008. *Id.* at ¶17. During a merger between ABN AMRO and RBS, Ridgeway was placed as a secondee in the RBS offices in Stamford, Connecticut. *Id.*  Following the merger, Ridgeway was employed by RBS as a Senior Operations Analyst and a Bank Reconciliation Analyst from November 2008 until April 22, 2010. *Id.* at ¶16.  In July of 2009, Ridgeway became a permanent employee of RBS, entitling him to retain all seniority, benefits, and vacation time from his previous employment with ABN AMRO. *Id.* at ¶18.

Ridgeway has a history of bank and spinal problems and has undergone three disectomies, surgical procedures to remove a herniated disc from the spinal canal. [Dkt. #1, Compl., ¶19]. On or about October 5, 2009, Ridgeway fell at work "exacerbating his preexisting back and spinal problems." *Id.* at 21.  During October and November 2009 Ridgeway took leave under the FMLA to complete a course of physical therapy.  *Id.* at 23.

Ridgeway asserts that at that time RBS used the calendar year method for calculating FLMA leave, allowing eligible employees to take their full FMLA leave each calendar year and full CTFMLA leave beginning on even years.  *Id.* at ¶¶28-29. Ridgeway had been previously informed of RBS's utilization of the calendar year method of calculating FMLA leave when, in May of 2009, Ridgeway sought

two to three weeks off for an emergency gallbladder removal, and he received a letter titled "Confirmation of FMLA and/or Application State Leave(s) of Absence Request" memorializing in paragraph four RBS's calendar year policy. *Id.* at ¶29. In October of 2009 when he applied for FMLA leave to pursue physical therapy treatment Ridgeway received the same letter titled "Confirmation of FMLA and/or Applicable State Leave(s) of Absence Request again memorializing in paragraph four RBS's calendar year policy. *Id.* at ¶30.

On December 14, 2009, Ridgeway was notified by letter entitled "Request for FMLA and/or Applicable State Leave(s) Approval Notice" that his leave time from October 5, 2009 through December 31, 2009 had been approved. [Dkt. #1, Compl., ¶31]. This letter did *not* indicate the calculation method relied upon by RBS to calculate FMLA and/or CTFMLA leave. *Id.* at ¶31.

At the conclusion of his physical therapy regimen in November 2009, Ridgeway's doctor informed him that he required surgery to repair the damage in his neck and back which would necessitate six to ten weeks of recovery and additional physical therapy. *Id.* at ¶23. On December 1, 2009, Ridgeway was informed that his orthopedic surgeon had an opening to perform the surgery on December 3, 2009. *Id.* at ¶24. Ridgeway contacted Hewitt, the third party administrator of RBS's benefit programs, to discuss his options for continuing his leave. *Id.* at ¶¶24-26.  Ridgeway explained to Hewitt that he would need two to three months to undergo neck surgery and physical rehabilitation, after which he would be able to return to work. [Dkt. #1, Compl., ¶26]. Hewitt told Ridgeway, on or about December 1, 2009, that he would be eligible for twelve weeks of FMLA

leave and an additional four weeks of CTFMLA leave, effective January 1, 2010. *Id.* at ¶27. Ridgeway asserts that he relied on Hewitt's representation that he was eligible to take a full sixteen weeks of protected medical leave and scheduled his neck surgery for December 3, 2009 expecting to use the remainder of the FMLA leave previously approved and the second FMLA leave which Hewitt said he was entitled to take to complete his recovery. The record does not indicate whether Ridgeway formally applied for FMLA leave. *Id.* at ¶34.

At the end of January 2010, Ridgeway received a letter dated January 25, 2010, from Dawn Hughes, a Human Resources representative at RBS, stating that his FMLA leave "ha[d] exhausted as of January 1, 2010 and your position as Senior Operations Analyst has been put into the posting process/is no longer available. Please note your employment will remain in force so long as your Disability claim is approved." [Dkt. #1, Compl., ¶ 35]. The letter did not specify the leave to which it referred and did not address Ridgeway's eligibility for leave under the CTFMLA. *Id.* at ¶36. The letter instructed Ridgeway to contact Hewitt (referred to as "HR Services") with questions. *Id.* at ¶37.

On February 17, 2010, Ridgeway contacted Hewitt to inquire about the letter from RBS deeming his leave exhausted. *Id.* at ¶38. Hewitt informed Ridgeway that Dawn Hughes was incorrect, and that he was in fact entitled to take FMLA/CTFMLA leave through the end of April 2010 because RBS was using the "calendar year" method to determine successive leave intervals such that the period in which an eligible employee was permitted to take a second, or successive leave, would be once in every calendar year. *Id.* at ¶40. RBS does not

4

dispute that a representative of Hewitt informed him that he was eligible for FMLA and CTFMLA leave through the end of April 2010. [Dkt. #1, Compl., ¶42]. Relying on Hewitt's representation that his leave was secure, Ridgeway remained at home to recover. *Id.* at ¶43.

In early April of 2010 Ridgeway received a letter dated March 31, 2010 from RBS entitled "Confirmation of FMLA and/or Applicable State Leave(s) of Absence Request." *Id.* at ¶44. The letter stated that his leave of absence beginning January 1, 2010, had been conditionally designated as FMLA leave. *Id.* The letter indicated that the conditional certification depended on the submission of medical information, return to work plans, and other documentation requirements. *Id.* at 46. The fourth paragraph stated "[u]nder RBS's FMLA leave policy colleagues can take up to 12 weeks of unpaid, job-protected leave in a rolling backward 12 month period . . ." representing a change in RBS's policy from the previously used calendar year method of calculating leave eligibility. [Dkt. #1, Compl., ¶44]. RBS employees were not previously notified of this change in the method of calculating FMLA leave. *Id.* at ¶45. Approximately one week later, Ridgeway received another letter from RBS entitled "Confirmation of FMLA and/or Applicable State Leaves of Absence Request," dated April 7, 2010 and virtually identical to the previously received letter dated March 31, 2010. *Id.* at ¶47.

Ridgeway contacted Hewitt on April 5th and April 9th to discuss the two letters. *Id.* at ¶48.  During both conversations, Hewitt representatives reassured Ridgeway that his leave was active and was approved through April 22, 2010. *Id.*

On or before April 13, 2010, Ridgeway contacted Connecticut's Department of Labor ("CT DOL") to seek their assistance in communicating with RBS about his protected leave under the FMLA and CTFMLA. [Dkt. #1, Compl., ¶53].  On the same day, the Principal Attorney of the Office Program Policy ("OPP Attorney") called Ridgeway back to notify him that she would initiate an investigation of his complaint. *Id.* at ¶54.  Pursuant to her investigation of Ridgeway's complaint, the OPP Attorney contacted RBS's in-house counsel Amy Gare, Dawn Hughes and other RBS employees, and requested documentation from RBs concerning Ridgeway's leave and their leave calculation methods. *Id.* at ¶¶55-56.

On April 16, 2010 Ridgeway spoke with a representative of Hewitt named "Ebony" who informed him that there was now an outstanding question as to whether his FMLA/CTFMLA leave should have been approved on December 1, 2009 for the period of January 1, 2010 through April 22, 2010. [Dkt. #1, Compl., ¶50].  Ebony confirmed, however, that his leave had been approved on December 1, 2009. *Id.*

On or about April 19, 2010, Ridgeway contacted Dawn Hughes to clarify his employment status with RBS and was informed that he was still employed by RBS. *Id.* at ¶51. On April 22, 2010, Dawn Hughes and her supervisor in RBS's Human Resources Department, Ronni Greenberg, contacted Ridgeway to inform him that he was terminated.  *Id.* at ¶57.

Since his termination, Ridgeway has actively, but unsuccessfully sought to obtain reemployment. [Dkt. #1, Compl.,¶58]. Ridgeway asserts, on information

and belief, that RBS employees informed prospective employers, prior to the initiation of the current lawsuit, that Ridgeway was suing RBS. *Id.* at ¶59.

Ridgeway also alleges that since his termination that "on information and belief, RBS employees have informed prospective employers that Ridgeway is suing RBS . . ." to retaliate against him for filing a complaint with the Connecticut Department of Labor seeking to vindicate his rights under the FMLA and CTFMLA.  [Doc. # 1 ¶¶ 59-60]. Ridgeway further asserts that he has lost job opportunities as a result of these statements. *Id.* at ¶60.

II.    **Standard of Review**

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (internal quotations omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 129 S.Ct. at 1949-50). "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 129 S.Ct. at 1950). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S.Ct. at 1949 (internal quotation marks omitted).

III.    Discussion

A.  Interference and Retaliation under the FMLA

In Count One of his complaint, Ridgeway asserts claims of both retaliation and interference in violation of the FMLA. In particular, Ridgeway alleges that RBS interfered with his right to take a federally protected leave of absence under the FMLA by approving his request for leave, then subsequently modifying its calculation method without notifying its employees, recalculating his eligibility for leave and reclassifying his previously approved leave as unprotected. Ridgeway alleges that RBS retaliated against him in violation of the FMLA by

refusing to restore him to the same or an equivalent position following his protected leave.

The FMLA entitles eligible employees to "twelve workweeks per year of unpaid leave, 'because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.' " *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 174 (2d Cir. 2006) (quoting 29 U.S.C. §2612(a)(1)(D). Following such leave, the FMLA provides that the employee is entitled to be restored to a position equivalent to that previously held, including equivalent pay and benefits. 29 U.S.C. §2614(a)(1). A regulation promulgated by the Secretary of Labor restricts an employee's right to return to an equivalent position following FMLA leave by providing that "[i]f the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA." 29 C.F.R. §825.216(c). The FMLA "creates a private right of action to seek both equitable relief and money damages against any employer . . . in any Federal or State court of competent jurisdiction should that employer interfere with, restrain, or deny the exercise of FMLA rights." *Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 724-25 (2003) (internal quotations and citations omitted).

In *Potenza v. City of New York*, 365 F.3d 165 (2d Cir. 2004), the Second Circuit acknowledged that claims of interference and retaliation raise distinct causes of action under the FMLA. 365 F.3d at 167-68. The Second Circuit "noted with some favor the manner in which the Seventh Circuit had distinguished the

two approaches." *Sista*, 445 F.3d at 176. The Second Circuit summarized the distinction as follows:

> A case from the Seventh Circuit emphasizes that the difference between the two approaches inheres in the relevance of the employer's intent to the determination of whether or not a violation has occurred. *Potenza*, 365 F.3d at 176 (citing *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999)).

Relying on the significance of intent in retaliation claims, as described by the Seventh Circuit, the Second Circuit instructed that the *McDonnell Douglas* burden-shifting analysis from the Title VII context should be applied to "claims of retaliation- where the employer's intent is material- but not to assertions of interference, where the question is simply whether the employer in some manner impeded the employee's exercise of his or her right." *Potenza*, 365 F.3d at 168. Therefore as claims of interference and retaliation are distinct causes of action subjected to different analyses, the Court will address each claim separately.

### 1. Interference

Ridgeway's interference claim alleges that RBS failed to provide him with proper notice of its FMLA policies thereby inhibiting Ridgeway's ability to secure approval for his desired period of FMLA leave. Ridgway asserts that he scheduled and obtained neck surgery in December of 2009 in reliance upon verbal confirmation from Hewitt, RBS's benefits administrator, that he was eligible for twelve weeks of FMLA leave and an additional four weeks of CTFMLA leave effective January 1, 2010. While on leave in January of 2010, Ridgeway contends that RBS altered its method of calculating FMLA leave without notifying him of the change, and subsequently notified him that his FMLA leave had been

exhausted as of January 1, 2010. Ridgeway's interference claim therefore appears to be predicated upon RBS's failure to notify him at the time that he requested FMLA leave of their method of calculating FMLA leave, such that he was induced to schedule and did in fact schedule an operation necessitating a lengthy period of leave under the false impression that the leave had been authorized.

RBS argues in support of its motion to dismiss that because Ridgeway was terminated in April of 2010 and received the full twelve weeks of FMLA leave to which he was entitled, he has failed to state a claim for interference.

While the FMLA does not define the term "interference," the United States Department of Labor has promulgated a regulation explaining that " '[i]nterfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. It would also include manipulation by a covered employee to avoid responsibilities under the FMLA." 29 C.F.R. §825.220(b).

Although the Second Circuit has addressed in several instances claims of interference under the FMLA, it has not yet articulated or identified the standard to be applied to interference claims. *See Potenza*, 365 F.3d at 168 (declining to articulate the standard governing interference claims where plaintiff's case involved retaliation rather than interference); *Sista*, 445 F.3d at 176 (declining to articulate the standard to be applied to inference claims where plaintiff failed to present evidence sufficient to substantiate either claim). "Because Potenza's case involves retaliation rather than interference, we need not decide whether or not to adopt the Seventh Circuit's analysis in its entirety").  The weight of

authority in the Circuit, as reflected in the decisions of district judges in the Southern, Eastern, Northern and Western Districts of New York, holds that in order to establish a *prima facie* case of interference in violation of the FMLA a plaintiff must show that:

> (1) [H]e is an "eligible employee" under the FLMA; (2) that [the employer] is an employer as defined in [the] FLMA; (3) that [he] was entitled to leave under [the] FMLA; (4) that [he] gave notice to [the employer] of [his] intention to take leave; (5) that [he] was denied benefits to which she was entitled under [the] FMLA. *See Higgins v. NYP Holdings, Inc.*, 2011 WL 6082702, at *9 (S.D.N.Y. Dec. 7, 2011); *Baker v. AVI Foodsystems, Inc.*, No. 10-CV-00159 (A)(m), 2011 WL 6740544, at *13 (W.D.N.Y. Dec. 6, 2011); *Debell v. Maimonides Med. Ctr.*, No. 09-CV-3491 (SLT)(RER), 2011 WL 4710818 (E.D.N.Y. Sept. 30, 2011);  *Leclair v. Berkshire Union Free Sch. Dist.*, No. 1:08-CV-01354 (LEK/RFT), 2010 WL 4366897, at *5 (N.D.N.Y. Oct. 28, 2010).

Defendant RBS does not dispute that Ridgeway has satisfied the first four essential components of an interference claim. The sole remaining dispute is whether or not Ridgeway's allegations satisfy the fifth component, requiring a denial of FMLA benefits.

The Second Circuit has recognized the potential for an interference cause of action premised upon "an employer's failure to post a notice where that failure leads to some injury." *Kosakow v. New Rochelle Radiology Assoc.*, 274 F.3d 706, 723-24 (2d Cir. 2001). Although ultimately concluding that such a proposition, even if cognizable, could not apply to the plaintiff whose eligibility to maintain a cause of action under the FMLA was in question, the Second Circuit discussed an Eastern District of Pennsylvania decision which recognized a cause of action based on deficiencies of notice and the provision of misleading information

which ultimately frustrated an employee's ability to exercise the right to take leave under the FMLA. *Id.*

 In *Fry v. First Fidelity Bancorporation*, No. CIV A. 95-6019, 1996 WL 36910 (E.D.P.A. Jan. 30, 1999), the plaintiff alleged that the defendant-employer interfered with her right to reinstatement by failing "to notify her that the first twelve weeks of her approved family leave was designated as FMLA leave, and that her right to reinstatement to the same or a comparable position pursuant to the FMLA expired at the end of that period," which misled her into requesting an additional four weeks of leave, thereby frustrating her right to reinstatement after returning from leave." 1996 WL 36910, at *4. The Eastern District of Pennsylvania held that these allegations stated a "valid cause of action under the FMLA, since adequate notice to employees concerning their FMLA right to reinstatement in light of any additional leave permitted by the employer is necessary to enable them to exercise their statutory right to reinstatement." *Id.*

 Such a cause of action is consistent with the prevailing standard for an interference claim within the Second Circuit, requiring that the purported interference ultimately results in the denial of a benefit under the FMLA.  Where the employee is not provided with the necessary information regarding the employer's FMLA leave policies, the employee is denied the ability to conform a desired period of leave to the employer's policies so as to preserve the right to reinstatement, a benefit at the crux of the FMLA's provisions. "For example, where an employee uses leave which might be counted on vacation time, FMLA leave, or both, an employer's failure to provide notice that the leave counts

against the FMLA allotment might interfere with the employee's ability to plan and use future FMLA leave to, for example, schedule elective surgery and recuperate from the surgery." *Donnellan v. New York City Transit Auth.*, No. 98 Civ. 1096 (BSJ), 1999 WL 527901, at *4 (S.D.N.Y. July 22, 1999).

Therefore, although the failure to provide notice of the terms of the FMLA, "where the lack of notice had no effect on the employee's exercise of or attempt to exercise any substantive right conferred by the Act," is insufficient to state a cause of action, the failure to provide notice which inhibits or restricts an employee from successfully obtaining leave or the right to reinstatement does result in a denial of benefits and can substantiate a cause of action for interference. *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 162 (2d Cir. 1999); *see also Sacco v. Legg Mason Inv. Counsel & Trust Co., N.A.*, 660 F.Supp.2d 302, 316 (D.Conn. 2009) (holding that "there was no actual 'interference' with [plaintiff's] FMLA rights because [defendant's] work requirements and the temporary lack of notice 'in no way affected [her] leave, benefits, or reinstatement.'")(quoting *Sarno*, 183 F.3d at 162).

Misleading information can also interfere with an employee's attempt to exercise his or her rights under the FMLA. *See Kanios v. UST, Inc.*, No. 3:03cv369 (DJS), 2005 WL 3579161, at *10-11 (D.Conn. Dec. 30, 2005) (denying a motion for summary judgment on an interference claim on the basis that plaintiff "may be able to prove that [the defendant] interfered with her FMLA rights by intentionally overstating the amount of leave available to her," thereby misinforming her of when she needed to return to work in order to secure the benefit of the right to

reinstatement). Indicating to an employee that he or she qualifies for a specific period of leave, and then subsequently informing the employee that the period of leave has expired or is no longer approved functions in the same manner as a lack of notice by preventing the employee from exercising the right to reinstatement, thereby denying an essential benefit of the FMLA.

Here, Ridgeway's claim of interference is predicated upon both a lack of notice and misinformation as having hindered his ability to return to his position of employment at RBS.  Although Ridgeway alleges that he had previously received notification from RBS that they calculated employee eligibility for FMLA leave using the calendar method, when Ridgeway requested a period of leave in October 2009 in order to undergo a course of physical therapy treatment, RBS's "Confirmation of Request for Leave" included no information regarding RBS's method of calculating FMLA leave. It was not until April 2010 that Ridgeway asserts he received notice of RBS's adoption of a different method of calculating employee eligibility for FMLA leave, utilizing a rolling-backward twelve month period. Accepting Ridgeway's allegations as true as the non-moving party, RBS's failure to notify Ridgeway of their method of calculating FMLA leave in advance of his desired period of leave deprived him of the ability to take FMLA leave while preserving the benefit of reinstatement. *See Donnellan*, 1999 WL 527901, at *4 (recognizing that failure to provide notice can constitute interference where the lack of notice prevents the employee from exercising benefits under the FMLA such as by scheduling elective surgery).  This lack of notice and its subsequent prejudice to Ridgeway alone is enough to substantiate a claim for interference.

A regulation promulgated by the Department of Labor in order to effectively implement the federal benefits conferred under the FMLA mandates that employer's provide notice to employee's who express an interest in exercising their benefits under the FMLA by notifying them within five business days of their eligibility to take FMLA leave. 29 C.F.R. §825.300(b)(1). The regulation further mandates that when such eligibility notice is provided, employers must also provide written notice detailing "the specific expectations and obligations of the employee and explaining ay consequences of failure to meet these obligations," including the applicable 12- month period for FMLA entitlement, any requirements for the employee to furnish certification of a serious health condition, the employer's right to substitute paid leave, the employee's right to maintain benefits during the FMLA leave and restoration to the same or equivalent job upon return from FMLA leave. 29 C.F.R. §825.300(c)(1)(ii), (iii), and (vi). The regulation explicitly provides that "[f]ailure to follow the notice requirements set forth in this section may constitute interference with, restraint, or denial of the exercise of an employee's FMLA rights." 29 C.F.R. §825.300(e).  Although a technical violation of these regulations, absent any prejudice to the employee in the form of interference with or restraint or denial of the ability to exercise FMLA rights is not actionable, deficiencies in notice which do prejudice the employee are sufficient to substantiate a claim of interference. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002); *see also* 29 C.F.R. §825.300(e).  Here, where RBS's failure to notify Ridgeway of their method of calculating FMLA leave deprived him of the ability to accurately assess his eligibility for leave and secure

his right to reinstatement, Ridgeway has clearly alleged that he was prejudiced by the deficiencies in notice so as to state a cognizable claim for interference.

Ridgeway further asserts that he received conflicting information from Hewitt and RBS which interfered with his ability to exercise his rights under the FMLA. Having received initial approval from Hewitt to take FMLA and CTFMLA leave from January through April 2010, Ridgeway alleges that in January, a month after he had begun his FMLA leave following surgery, RBS informed him by letter that this FMLA leave had been exhausted as of January 1, 2010. Ridgeway contends that the letter further provided that his employment "would remain in force so long as your Disability claim is approved."  After again receiving verbal confirmation from Hewitt that he was eligible for FMLA leave through April 2010, Ridgway asserts that he received two additional letters in April 2010 informing him that his leave had been conditionally designated as FMLA leave, and setting forth a new method of calculating FMLA leave by applying a rolling-backward twelve month period. Ridgeway contends that he was ultimately terminated on April 22, 2010.

Accepting Ridgeway's allegations about this series of communications as true, Ridgeway received misleading and contradictory information from Hewitt and RBS, denying him the ability to understand his rights and benefits under the FMLA and thereby frustrating his efforts to exercise those rights. The dissemination of misinformation described in Ridgeway's factual allegations is even more prejudicial than a lack of notice, as any attempt to discern the true status of his leave was obscured by the directly contradictory notice he received.

17

In addition to the adequately plead claim of interference on the basis of a lack of notice and misinformation, the communications conveyed by RBS and Hewitt constitute discouragement. "[C]ourts in the Second Circuit require a Plaintiff who asserts a FMLA interference claim on a "discouragement" theory to offer evidence that she tried to assert her FMLA rights and was thereafter discouraged from taking FMLA leave, unless the employer's purported acts of discouragement would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." *Reilly v. Revlon*, 620 F.Supp.2d 254 (S.D.N.Y. 2009) (citing *Golden v. New York City Dept. of Envir. Protection*, 2007 WL 4258241 (S.D.N.Y. Dec. 3, 2007). In light of the verbal authorization to take FMLA and CTFMLA between January 1 and April 22, 2010, the January 2010 letter indicating that his FMLA leave was exhausted constitutes discouragement, as it could have prompted Ridgeway to abandon his leave and attempt to return to work prematurely. *See* 29 C.F.R. §825.220(b) (defining interfering with the exercise of an employee's rights as including "discouraging an employee from using such leave."). Further, the April 16, 2010 conversation with Hewitt informing Ridgeway that there was an outstanding question as to whether his leave should have been approved could have discouraged Ridgeway from remaining on leave, prompting him to return to work to preserve his employment with RBS.

Accordingly, where Ridgeway's allegations of a lack of notice and misleading information, and discouragement assert that he was denied the ability to exercise his right to reinstatement, an essential benefit under the FMLA,

Ridgeway has sufficiently alleged a claim of interference. RBS's motion to dismiss Ridgeway's interference claim is therefore DENIED.

> ### 2. Retaliation

As discussed above, Ridgeway alleges that RBS retaliated against him in violation of the FMLA by refusing to restore him to the same or an equivalent position following his protected leave.

"Failure to reinstate an employee to a prior position or its equivalent following FMLA leave is a properly plead FMLA interference claim." *Gauthier v. Yardney Technical Products, Inc.*, 2007 WL 2688854, at *7 (D.Conn. Sept. 13, 2007); *see also Roberts v. Ground Handling, Inc.*, 499 F.Supp.2d 340 (S.D.N.Y. 2007) (analyzing a claim relating to a failure to reinstate following FMLA leave as a claim of interference); *Leach v. State Farm Mut. Auto Ins. Co.*, 431 Fed. Appx. 771, 776 (11th Cir. 2001) ("[I]t is undisputed that State Farm refused to let Leach return to his former position after his FMLA leave ended. Thus, Leach made a prima facie showing of FMLA interference with his right to reinstatement."); *see also Ford-Evans v. Smith*, 206 Fed.Appx. 332, 335 (5th Cir. 2006) ("the right to reinstatement upon return from leave is a right protected by FMLA's interference provision"); *Kauffman v. Fed Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005); *Haley v. Alliance Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004).

However, Ridgeway's complaint explicitly identifies the failure to reinstate as the factual predicate for a retaliation claim rather than as additional support for his interference claim. *See* Dkt. #1, Compl., ¶64. ("Defendants retaliated against Plaintiff in violation of the FMLA when it refused to restore him to the same or an

equivalent position following his protected leave."). Further, Ridgeway's claim differs from the standard FMLA interference claims predicated upon a failure to reinstate because Ridgeway was terminated upon the conclusion of his CTFMLA leave, which extended for four weeks following his FMLA leave, rather than following his FMLA leave. The right to reinstatement under the FMLA expires when FMLA leave expires. *See Degraw v. Exide* Technologies, 744 F.Supp.2d 1199, 1215 (D.Kan. 2010) (collecting cases); *see also Sarno*, 183 F.3d at 161-62 (holding that defendant did not interfere with plaintiff's FMLA rights where plaintiff remained unable to perform the essential functions of his position at the end of his FMLA leave).  Therefore although Ridgeway may be able to assert a claim of interference pursuant to the CTFMLA on the basis of a failure to reinstate,  such a claim is not cognizable as a violation of FMLA, where Ridgeway remained on leave beyond the expiration of his FMLA leave. *See* Conn. Gen. Stat. §31-51nn(a) (providing for a right of reinstatement to the original position of employment or an equivalent position upon return from leave pursuant to Conn. Gen. Stat. §31-51*ll*, the CTFMLA). Further, Ridgeway does not appear to assert that the misinformation and ultimate termination was retaliation for taking the first period of FMLA leave. Thus, the Court will analyze Ridgeway's failure to reinstate claim as a retaliation claim.

As the Second Circuit in *Potenza* unambiguously instructed, retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting test. 365 F.3d at 168. In order to assert a prima facie claim of retaliation against the exercise of rights under the FMLA, Ridgeway must establish that: "1) he exercised rights

protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Id.* "The *McDonnell Douglas* burden-shifting framework is an evidentiary standard, not a pleading requirement," therefore a plaintiff need only allege facts sufficient to state a claim and not sufficient to establish a prima facie case. *Boykin v. KeyCorp*, 5231 F.3d 202 (2d Cir. 2008)(internal quotations omitted); *see also Peterson v. Long Island R.R. Co.*, No. 10-cv-480, 2010 WL 2671717, at *2 (E.D.N.Y. June 30, 2010)("a complaint asserting an employment discrimination claim, including an FMLA retaliation claim,  need not plead specific facts establishing a prima facie case of discrimination in order to survive a motion to dismiss").

In its motion to dismiss, RBS argues that Ridgeway has failed to state a claim of retaliation where Ridgeway has not alleged that he was willing and able to return to work upon the completion of his FMLA leave. RBS argues that if Ridgeway's FMLA began on January 1, 2010, his twelve weeks of FMLA leave would have expired on March 25, 2010. RBS asserts that because Ridgeway does not allege in his complaint that he was able to and attempted to return to his position by March 25, 2010, whatever obligation RBS had to restore him to his former position under the FMLA expired.

To support this argument, RBS relies heavily on the Second Circuit's decision in *Sarno* for the proposition that where an employee remained unable to perform the essential functions of his position after FMLA leave, failure to restore the employee to his position does not constitute a violation of the FMLA. RBS's

reliance on *Sarno* is misplaced as *Sarno* dealt exclusively with a claim of interference under the FMLA predicated upon a failure to provide adequate notice of the employee's rights under the FMLA as an impediment to the employee's right to reinstatement. 183 F.3d at 161-62. As previously discussed, Ridgeway's allegations regarding failure to reinstate assert a claim of retaliation rather than interference, therefore *Sarno*'s failure to reinstate analysis is inapposite.

Applying the burden-shifting *McDonnell Douglas* framework, the Court concludes that Ridgeway has sufficiently alleged a claim of retaliation in violation of the FMLA. It is undisputed that Ridgeway has satisfied the first and third elements of a retaliation claim, as Ridgeway exercised rights under the FMLA by attempting to take leave protected under the FMLA and he suffered an adverse employment action when he was terminated on April 22, 2010 after the period of leave.  Further, RBS does not dispute that Ridgeway was qualified for position. *See McGinnis v. New York Univ. Med. Ctr.*, 2012 WL 251961, at *3 (S.D.N.Y. Jan. 25, 2012) (assuming that plaintiff established the requirement of qualification for the position in the context of an FMLA retaliation claim where the defendant did not dispute this element). Lastly, the Court finds that Ridgeway's allegations satisfy his burden to sufficiently plead facts to create a reasonable inference of retaliatory intent.

Ridgeway's allegations support a plausible inference that his termination on April 22, 2010 was the culmination of a protracted campaign of retaliation against him for having requested two successive periods of protected medical leave. In particular, Ridgeway contends that as early as January 25, 2010, after his

first period of FMLA leave had ended and less than four weeks after his second successive FMLA leave began, RBS contacted him and informed him that his leave had been exhausted as of January 1, 2010 and his position had been put in the posting process and was no longer available.  Although the FMLA does not require employers to hold an employee's exact position during a period of FMLA leave, requiring only that the employer reinstate the employee to the same or an equivalent position at the end of the leave, reassigning an employee's position during or following FMLA leave can contribute to an inference of retaliation. *Adams v. Northstar Location Services, LLC*, No. 09-CV-1063 (JTC), 2010 WL 3911415, at *6 (W.D.N.Y. Oct. 5, 2010).

Ridgeway alleges that RBS then informed him in April of 2010 that his request for leave had been "conditionally designated" as FMLA Leave, conditioned upon the submission of medical information and other documentation requirements, and notifying him that RBS's method of calculating FMLA leave had been changed from the calendar year method to a 12 month rolling-backward approach.  These allegations create a plausible inference that RBS, frustrated with Ridgeway's request for a second successive period of leave, deceptively changed its method of calculating FMLA leave during Ridgeway's period of leave, after having informed Ridgeway that he was eligible for the leave, such that Ridgeway no longer would no longer be entitled to reinstatement, enabling the Company to terminate him. This alleged conduct undeniably creates an inference of retaliatory intent. Whether or not the evidence will substantiate

the allegations regarding a campaign of retaliation is an issue reserved for summary judgment or the trier of fact at trial.

The timing of Ridgeway's termination lends further support to an inference of retaliatory intent. Temporal proximity between a plaintiff's exercise of rights created by FMLA and an adverse employment action can give rise to an inference of retaliation. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010); *see also Reilly v. Revlon*, 620 F.Supp.2d at 538.  Ridgeway was terminated on the final date of his medical leave, on April 22, 2010, and eight days after he contacted Connecticut's Department of Labor to seek their assistance in communicating with RBS about his protected leave. Whereas an adverse employment action taken several months after the exercise of protected rights is too attenuated to give rise to an inference of retaliation, a termination on the very day that the protected leave expired and within days of the reporting of a potential violation of rights to a state agency is certainly sufficient to create such an inference. *See Reilly*, 620 F.Supp.2d at 538-39 (holding that no inference of discrimination could be drawn where plaintiff was terminated two and a half months after the expiration of her FMLA leave).

Lastly, the Court finds that Ridgeway has sufficiently plead facts to suggest that he was able to and intending to return to work following the expiration of his protected medical leave. Ridgeway's allegations indicate that throughout his receipt of conflicting information from RBS and Hewitt regarding his FMLA coverage, he remained in constant contact with both RBS and Hewitt, attempting to confirm the status of his leave and his employment with RBS. In

fact, on April 19, 2010, three days prior to his termination, Ridgway contacted Dawn Hughes, a human resources employee at RBS, to confirm his employment status with the company and received informed that he was in fact, still employed. A plausible inference may be drawn from these various attempts to clarify and confirm the status of his leave and employment that Ridgeway intended to return to work at RBS on April 23, 2010, the date following his protected leave. It is further apparent from Ridgeway's factual allegations that he was ultimately denied the opportunity to seek reinstatement when he was terminated on April 22, 2010, the last day of his medical leave.  These allegations give rise to a plausible inference that Ridgeway intended to and was capable of returning to work following his medical leave and the Court is obligated in review of a motion to dismiss to assume their veracity. *See Iqbal*, 129 S.Ct. at 1940-41 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."). To the extent that RBS disputes whether Ridgeway was in fact capable of returning to work following his medical leave, such an argument is more appropriate on a motion for summary judgment at which time the Court would have the opportunity to examine the factual record as presented by the parties. This is particularly true where, as here, the employee attempted to schedule leave in conformity with the employer's policies before undergoing a medical procedure necessitating the use of leave.

Moreover, while Ridgeway's ability to return to work following his medical leave would be a critical component of an interference claim predicated upon the

failure to reinstate, it is irrelevant to Ridgeway's claim of retaliatory discharge, asserting that he was terminated in retaliation for having requested and/or taken leave before he had the opportunity to attempt to return to work upon the conclusion of the medical leave.   *See Sarno*, 183 F.3d at 161-62 (holding that defendant did not interfere with plaintiff's FMLA rights where plaintiff remained unable to perform the essential functions of his position at the end of his FMLA leave). The Court notes that *Sarno* did not involve an inability to return based on the employer's misinformation as to its FMLA policy.

As an aside, to the extent that Ridgeway claims that RBS's employees were gratuitously informing other potential employers of Ridgeway that he attempted to exercise his right to redress the interference with and retaliation against his exercise of his FMLA rights by filing suit as permitted by the FMLA, this too could constitute retaliation.

Accordingly, the Court finds that Ridgeway has plausibly alleged a claim of retaliation in violation of the FMLA. RBS's motion to dismiss Ridgeway's retaliation claim is DENIED.

To the extent that RBS argues that both claims under the FMLA must be dismissed because Ridgeway does not have any damages as a result of the alleged FMLA violations, the Court notes that Ridgeway has alleged in his complaint that the alleged violations have caused him to suffer, among other things, "lost compensation, seniority, and benefits." [Dkt. #1, Compl., ¶66]. In reviewing a motion to dismiss, the Court must accept these factual allegations as true. *Iqbal*, 129 S.Ct. at 1940-41.

### B.  Wrongful Termination in Violation of Public Policy

Ridgeway's second claim contends that he was wrongfully terminated in violation of the public policy expressed in Conn. Gen. Stat. §31-51ll, a provision of the CTFMLA providing, in relevant part, that eligible employees are entitled to sixteen weeks of protected medical leave during any twenty-four month period. Conn. Gen. Stat. §31-51ll(a). RBS moves to dismiss this claim, asserting that the claim is precluded by the statutory remedies available under Conn. Gen. Stat. §31-51pp and Conn. Gen. Stat. §31-51m.

Although generally under Connecticut law "contracts of permanent employment, or for an indefinite term, are terminable at will," a common law cause of action in tort for the discharge of an at will employee exists in limited circumstances. Such remedy is available subject to two particular limitations: (1) the former employee must establish "a demonstrably *improper* reason for dismissal, a reason whose impropriety is derived from some important violation of public policy," *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 475 (1980); and (2) the employee must establish that he or she was "otherwise without remedy and that permitting the discharge to go unredressed would leave a valuable social policy to go unvindicated." *Atkins v. Bridgeport Hydraulic Co.*, 5 Conn.App. 643, 648 (1985).

Ridgeway has failed to plausibly allege a claim of wrongful termination where he cannot demonstrate that he is otherwise without remedy such that his discharge would go unredressed given the express statutory remedies provided by the CTFMLA. Conn. Gen. Stat. §31-51pp(c)(2) provides that:

> Any employee aggrieved by a violation of this
> subsection may file a complaint with the Labor
> Commissioner alleging violation of the provisions of
> this subsection. Upon receipt of any such complaint, the
> commissioner shall hold a hearing. After the hearing,
> the commissioner shall send each party a written copy
> of the commissioner's decision. The commissioner may
> award the employee all appropriate relief, including
> rehiring or reinstatement to the employee's previous
> job, payment of back wages and reestablishment of
> employee benefits to which the employee otherwise
> would have been eligible if a violation of this subsection
> had not occurred. Any party aggrieved by the decision
> of the commissioner may appeal the decision to the
> Superior Court in accordance with the provisions of
> chapter 54.

Supplementing this statutory remedy, Conn. Gen. Stat. §31-51m(c) provides that:

> Any employee who is discharged, disciplined or
> otherwise penalized by his employer in violation of the
> provisions of subsection (b) may, after exhausting all
> available administrative remedies, bring a civil action,
> within ninety days of the date of the final administrative
> determination or within ninety days of such violation,
> whichever is later, in the superior court for the judicial
> district where the violation is alleged to have occurred
> or where the employer has its principal office, for the
> reinstatement of his previous job, payment of back
> wages and reestablishment of employee benefits to
> which he would have otherwise been entitled if such
> violation had not occurred. An employee's recovery
> from any such action shall be limited to such items,
> provided the court may allow to the prevailing party his
> costs, together with reasonable attorney's fees to be
> taxed by the court. Any employee found to have
> knowingly made a false report shall be subject to
> disciplinary action by his employer up to and including
> dismissal.

This statutory scheme permits Ridgeway to raise the purported denial of his

CTFMLA rights before first the Connecticut Department of Labor, and then,

following this exhaustion of this administrative remedy, to challenge the DOL's determination in court.

Ridgeway's attempt to circumvent the administrative remedy as inadequate is unavailing. Ridgeway contends that he should not be required to exhaust his administrative remedies before pursuing his claim of wrongful termination predicated upon violations of the CTFMLA because the administrative remedy provided is inadequate. Although Ridgeway correctly notes that the Connecticut Supreme Court has recognized exceptions to an exhaustion requirement, such exceptions have been recognized "infrequently and only for narrowly defined purposes . . . such as when recourse to the administrative remedy would be futile or inadequate." *Stepney v. Fairfield*, 263 Conn. 558, 565 (2003). Whereas "[i]t is well established that [a]n administrative remedy is futile or inadequate if the agency is without the authority to grant the requested relief," Ridgeway provides no case law to suggest that an administrative remedy may be deemed inadequate so as to trigger this exception where the administrative remedy on the basis of the length of the administrative process prescribed. *Neiman v. Yale University*, 270 Conn. 244, 259 (2004); *see also Stepney*, 263 Conn. at 565 ("Because of the policy behind the exhaustion doctrine, we construe these exceptions narrowly.").

Where the statutory remedies available to Ridgeway under the CTFMLA provide him with an adequate method to seek redress for the alleged denial of his rights under the CTFMLA, enabling him to present his claim to the CT DOL for a determination and subsequently challenge this administrative determination in court to seek reinstatement, payment of back wages, reestablishment of

employee benefits, and reasonable attorney's fees if he is the prevailing party,
Ridgeway's common law claim of wrongful termination is precluded.

Accordingly, RBS's motion to dismiss Ridgeway's second claim for
wrongful termination in violation of public policy is GRANTED.

### C. Violation of Conn. Gen. Stat. 31-51q

Ridgeway's third claim asserts that Ridgeway was terminated in retaliation
for having spoken out about RBS's interference with his protected medical
benefits, alleging that he was terminated approximately three days after the CT
DOL's contact with RBs on his behalf. Ridgway contends that his contact with the
CT DOL raised a matter of public concern and that such speech was a motivating
factor that led to his termination.

RBS argues that this claim must be dismissed because Ridgeway's speech
dealt entirely with a matter of private concern, addressing his family and medical
leave. Further, RBS asserts that Ridgeway has failed to allege an essential
element of a claim pursuant to §31-51q, that his speech did not substantially or
materially interfere with his bona fide job performance or his working relationship
with his employer.

To state a claim under Section 31-51q, "a plaintiff must allege that (1) he
was exercising rights protected by the First Amendment to the United States
Constitution (or an equivalent provision of the Connecticut Constitution); (2) he
was fired on account of his exercise of such rights; and (3) his exercise of his
First Amendment rights did not substantially or materially interfere with his bona

fide job performance or with his working relationship with his employer."
*D'Angelo v. McGoldrick*, 230 Conn. 356, 361 (1996).

Section 31-51q extends the protection of the rights of free speech beyond simply freedom of speech in the public arena, but "nevertheless, the statute does not protect all speech. The statute applies only to expressions regarding pubic concerns that are motivated by an employee's desire to speak out as a citizen." *Campbell v. Windham Comm. Memorial Hosp., Inc.*, 389 F.Supp.2d 370, 381-82 (D.Conn. 2005) (internal citations and quotation omitted). The statute, therefore, draws a distinction between speech "as a citizen upon matters of public concern," or "instead as an employee upon matters only of personal interest." *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)).

Ridgeway's allegations regarding his communications with the CT DOL indicate that he conveyed concerns focused solely on his individual rights under the FMLA and CTFMLA. Ridgeway states that he "contacted the Connecticut Department of Labor ("CT DOL") regarding his protected leave and sought the CTDOL's assistance in communicating with RBS about his protected leave under the FMLA and CTFMLA." [Dkt. #1, Compl., ¶53]. Absent any allegations that his communication with the CT DOL  addressed anything other than the terms and conditions of his employment, Ridgeway has failed to allege that he was terminated on the basis of speech on a matter of public concern. *See Campbell*, 389 F.Supp.2d at 382 (citing *Winik-Nystrup v. Manuf. Life Ins. Co.*, 8 F.Supp.2d 157, 160 (D.Conn. 1998).

Accordingly, RBS's motion to dismiss is granted as to Ridgeway's claim under Conn. Gen. Stat. §31-51q. To the extent that RBS requests an award of costs and attorneys' fees for its defense of this claim, such request is denied as the Court finds that this claim was not brought without substantial justification. *See Williams v. Bayer Corp.*, 982 F.Supp. 120 (D.Conn. 1997) (holding that attorney's fees may be awarded upon a finding that a §31-51q action was brought "without substantial justification") (citing Conn. Gen. Stat. §31-51q).

### D. Promissory Estoppel

Ridgeway's fourth claim asserts that RBS and its agent, Hewitt, promised him that he was entitled to take sixteen weeks of medical leave under the FMLA and CTFMLA  and then return to the same or an equivalent position. Ridgeway contends that it was reasonably foreseeable that he would rely on this promise, and that he did in fact rely to his detriment, as he scheduled and underwent surgery and was fired while on medical leave following the surgery.

RBS argues that this claim is virtually identical to his FMLA and CTFMLA claims, and therefore, where there are statutory remedies available, Ridgeway's promissory estoppel claim should be precluded. To support this contention, RBS relies on *Burnham v. Karl and Gelb, P.C.*, 252 Conn. 153 (2000), for the proposition that where a statute provides a remedy, the statutory remedy is the exclusive remedy and precludes any common law actions in either tort or contract. This proposition, however, is far broader than the actual holding in *Burnham*.

In *Burnham*, the Connecticut Supreme Court held that plaintiff's claim of wrongful termination for having reported the defendant's unsafe dental practices was precluded by the statutory remedy available in Conn. Gen. Stat. §31-51m, providing both an administrative remedy and a subsequent cause of action to employees alleging retaliation against the reporting of a suspected violation of any state or federal law. *See Burnham*, 252 Conn. 153.  Following *Burnham*, it is well-established that Conn. Gen. Stat. §31-51m, the Connecticut whistleblower statute preempts all contract and tort claims for wrongful termination based on whistleblowing activities. *See Naser v. Ravago Shared Services, LLC*, No. 3:10-CV-573 (WWE), 2010 WL 3829159 (D.Conn. Sept. 20, 2010) (citations omitted); *see also Konspore v. Friends of Animals, Inc.*, 2010 WL 3023820 (D.Conn. Aug. 2, 2010) (recognizing that Section 31-51m provides the exclusive remedy for employees who are terminated for whistleblowing); *Pickering v. Aspen Dental Management, Inc.*, 100 Conn.App. 793, 799 (2007) (holding that plaintiff's common law wrongful termination claim was precluded by §31-51m).

However, RBS has presents no authority to substantiate its contention that this holding provides that where *any* statutory remedy exist, common law claims are precluded. Although several Connecticut Superior Court cases have, relying on *Burnham*, held that "[a]s a general rule, the existence of a statutory remedy precludes a plaintiff from bringing a common-law claim," the Court is unable to find any such cases precluding a common law claim on the basis of the statutory remedies codified in CTFMLA, rather such cases appear to preclude only common law claims of wrongful termination and breach of the implied covenant

of good faith and fair dealing. *Geysen v. Securitas Sec. Services, U.S.A., Inc.*, No. MMXCV095007429S, 2009 WL 4913320 (Conn. Super. Nov. 18, 2009) (holding that a claim of a breach of the implied covenant of good faith and fair dealing is precluded by the existence of a statutory remedy); *see also*, *Villa v. MacDermid, Inc.*, No. CV065004233S, 2010 WL 1667289 (Conn. Super. Mar. 31, 2010) (holding that plaintiff's claim of wrongful termination was precluded by Conn. Gen. Stat. §31-51m).

Where state law is unclear, federal courts interpreting state law must predict how the highest court of the State would resolve the question at bar. *Travelers Insurance Co v. 633 Third Associates*, 14 F.3d 114, 119 (2d Cir. 1994). Relying on the Connecticut Supreme Court's more recent decision regarding the preemption of common law claims by an express statutory remedy, it appears that the existence of an exclusivity provision in the statutory provision in question is relevant to the determination of whether common law claims are precluded. In *DeOliveira v. Liberty Mut. Ins. Co.*, 273 Conn. 487 (2005), the Connecticut Supreme Court held that the express statutory remedies provided under Connecticut's workers' compensation law precluded a common law claim against an insurer for bad faith processing of a workers' compensation claim, in part on the basis of an exclusivity provision within the workers' compensation statute. The Connecticut Supreme Court recognized that, "the exclusivity provisions 'manifests a legislative policy decision that a limitation on remedies under tort law is an appropriate trade-off for the benefits provided by workers'

compensation.'" *DeOliveira*, 273 Conn. at 496 (quoting *Driscoll v. General Nutrition Corp.*, 252 Conn. 215, 220-21 (2000).

By contrast, the CTFMLA has a non-exclusivity provision, stating that "[t]he rights and remedies specified in this subsection are cumulative and nonexclusive and are in addition to any other rights or remedies afforded by contract or under other provisions of law." Conn. Gen. Stat. §31-51pp(3). Whether or not the phrase "provisions of law" was intended to refer to other statutory schemes or common law, this provision as a whole indicates that the CTFMLA is not intended to function as an exclusive remedy to aggrieved employees. Therefore, where RBS has failed to present any authority indicating that the provisions of the CTFMLA preclude common law claims of promissory estoppel and given the CTFMLA's non-exclusivity provision, the Court will not preclude Ridgeway from raising a claim of promissory estoppel in conjunction with his CTFMLA claim.

The Court is similarly unable to hold that Ridgeway's Connecticut common law claim of promissory estoppel is precluded by the FMLA, given the express language of Section 2651(b) of the FMLA, stating that "[n]othing in this Act or any amendment made by this Act shall be construed to supersede any provision of any State or local law that provides greater family or medical leave rights than the rights established under this Act or any amendment made by this Act." 29 U.S.C. §2651(b). Section 2651(b) of the FMLA "makes clear that the Act will not curtail rights established by any state or local law" which is "proof that Congress did not wish for federal law—and therefore federal courts—to control the field in this

area of litigation. Rather, Congress intended that the FMLA serve as a complement to state law." *Bellido-Sullivan v. American Intern. Group, Inc.*, 123 F.Supp.2d 161 (S.D.N.Y. 2000). Although courts have held that where a plaintiff has filed a claim under the FMLA, such claim precludes a state common law claim of wrongful discharge, the Court finds no precedent to suggest that an FMLA claim precludes *all* related state common law claims, such as promissory estoppel. *See, e.g., Nanos v. City of Stamford*, 609 F.Supp.2d 260 (D.Conn. 2009) (holding that plaintiff's claim of wrongful discharge was precluded by the existence of statutory remedies under the FMLA and the ADA). Rather, as this Court has recognized in the past, a plaintiff may pursue simultaneously a claim under the FMLA and a Connecticut common law claim of promissory estoppel. *Gauthier v. Yardney Technical Products, Inc.*, No. 3:05-cv-1362(VLB), 2007 WL 2688854 (D.Conn. Sept. 13, 2007) (denying defendant's motion for summary judgment as to plaintiff's promissory estoppel claim premised upon promises relating to plaintiff's employment status which were similar to the factual predicate for plaintiff's claim under the FMLA).

To establish a *prima facie* case of promissory estoppel a plaintiff must establish the following elements: "(1) a promise (2) which the promisor should reasonably expect to induce action or forbearance (3) on the part of the promisee or a third person and (4) which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Ferrucci v. Town of Middlebury*, 131 Conn. App. 289, 305 (2011) (citing RESTATEMENT (SECOND) OF CONTRACTS § 90 (1) (1981)).

To establish such a claim, Ridgeway alleges that RBS promised "that he was entitled to take sixteen weeks of medical leave under the FMLA and CTFLA and then return to his position or to an equivalent position with RBS once he was medically cleared to return to work."  [Dkt. #1, Compl., ¶ 77].  RBS does not dispute that this language is sufficiently "clear and definite" so as to constitute a clear promise. *See Stewart v. Cendant Mobility Services, Corp.*, 267 Conn. 96, 105 (2003) (citation omitted). Further, the promise, as alleged, reflects "a present intent to commit," rather than a "mere statement of intent to contract in the future," as the language of the promise was clear and definite, absent any references to hope desire or opinion. *See id.* at 105.

Ridgeway's allegations satisfy the second and third elements as well, demonstrating from the context of the promise that RBS and its agent, Hewitt, should have reasonably expected Ridgway to rely on the promise. Ridgway alleges that the promise was made following Ridgeway's request to take leave in order to undergo surgery, conveying to both RBS and its agent, Hewitt, that Ridgeway would rely on the promise of the protected medical leave by undergoing the surgery, necessitating his absence from work.

Lastly, it is exceedingly apparent from Ridgeway's allegations that he did in fact rely on the promise conveyed, by undergoing surgery and taking the medical leave to which he was promised to be entitled.

Accordingly, RBS's motion to dismiss Ridgeway's claim of promissory estoppel is DENIED.

### E.  Negligent Misrepresentation

Ridgeway's fifth and final cause of action asserts that RBS made false representations which they knew or should have known were incorrect regarding his entitlement to protected medical leave under the FMLA and CTFMLA. Ridgeway further contends that he reasonably relied on these representations to his detriment, suffering lost compensation, seniority, benefits, and other rights, privileges and conditions of employment.

Defendants argue that this claim should be dismissed because under Connecticut law claims by employees against their employers for negligence during an ongoing employment relationship are not cognizable, and because this common law claim is precluded by the statutory remedies provided by the CTFMLA and FMLA.

Ridgeway's claim of negligent misrepresentation is not barred as a matter of law. RBS's reliance on *Perodeau v. City of Hartford*, 259 Conn. 729, 758-63 (2002) is misplaced. [Dkt. #18, Def.'s Mem., p. 25]. In *Perodeau*, the Connecticut Supreme Court held that negligence claims for emotional distress, arising during the course of employment, are not actionable. *Perodeau*, 259 Conn. at 758. However, a careful reading of the decision reveals that this holding is only applicable to emotional distress claims. The court opines before its holding that "it is clear that individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace," which is indicative of the scope of the court's holding. *Id.* at 757. Further, the court's reasoning further evinces that the scope of the holding is limited to claims of negligent infliction of emotional

38

distress.  First, the court reasoned that threat of litigation during continuing employment would cause a "pervasive chilling effect [that] outweighs the safety interest of employees in being protected from *negligent infliction of emotional distress*."  *Id.* at 758 (emphasis added).  Second, the court noted that the "inherently competitive and stressful nature of the workplace and the difficulties surrounding proof of *emotional distress*, extending the tort of *negligent infliction of emotional distress* to ongoing employment relationships would open the door to spurious claims."  *Id.* (emphasis added).  Thus, the court held that "an individual municipal employee may not be found liable for *negligent infliction of emotional distress* arising out of conduct occurring within the employment context."  *Id.* at 762 (emphasis added).  The *Perodeau* holding is riddled with constant references to the emotional nature of the claims in the case and the public policy concerns pertaining specifically to emotional distress.

       *Grunberg v. Quest Diagnostics, Inc.*, 2008 WL 323940 at *9 (D. Conn. Feb. 5, 2008), upon which RBS also relies, is similarly distinguishable because the plaintiff alleged negligent misrepresentation arising out of the same locus of operative facts as her other claims.  These operative facts emphasized the infliction of emotional distress upon the plaintiff.  [*See generally*, 3:05CV1201 Dkt. #1, Complaint, ¶¶ 1 – 20, 87 – 94].  Unlike *Grunberg*, Ridgeway's negligent misrepresentation claim does not focus on negligent infliction of emotional distress and does not violate the public policies listed in *Perodeau*.  At most, Ridgeway asserts a cursory request for emotional distress damages.  [*See* Dkt. #1, Complaint, ¶ 87].  Where the claim asserted is not for negligent infliction of

emotional distress, but rather negligent misrepresentation, the claim of negligent misrepresentation is not barred as a matter of law.  *See Kanios*, 2005 WL 3579161 at *11 (denying summary judgment on a claim for negligent misrepresentation of an FMLA leave by the plaintiff).


     A claim of negligent misrepresentation is established when (1) the defendant made a misrepresentation, (2) the defendant knew or should have known that the representation was false at the time, and (3) the plaintiff reasonably relied upon the representation to the plaintiff's detriment.  *Kanios v. UST, Inc*., 2005 WL 3579161 at *11 (D. Conn. Dec. 30, 2005).

     Ridgeway's allegations sufficiently assert that RBS and its agent Hewitt misrepresented his entitlement to FMLA and CTFMLA leave between January 1, 2010 and April 22, 2010.  Further, the allegations assert that RBS/Hewitt knew or should have known that his entitlement to protected medical leave was misrepresented. Although Hewitt informed Ridgway in December 2009 that he was entitled to such leave, Ridgeway alleges that on January 25, 2005, RBS informed him that his leave entitlement to FMLA leave had in fact been exhausted as of January 1, 2010. After a period of conflicting exchanges between Ridgeway and RBS/Hewitt, Ridgeway was ultimately informed on April 16, 2010 that there was an outstanding question as to whether or not his leave should have been approved.  As Ridgeway has alleged, RBS changed its method for calculating FMLA and CTFMLA leave from the calendar year method, to a twelve month rolling backward approach. Although Ridgeway did not allege the exact date

upon which RBS adopted this new approach, he has plausibly alleged that RBS knew or should have known, at the time that his leave was approved in December 2009, that he was not in fact entitled to such leave, given the new calculation method. In changing their policies for calculating leave, the RBS is obligated to ensure that its employees are provided with accurate assessments of their entitlement to protected medical leave. With the benefit of discovery, the parties can further explore the timing of this change in the calculation method. If in fact, RBS had not yet adopted the 12 month rolling backward approach in December of 2009, such that Ridgeway's approval was not a misrepresentation of his entitlement to leave, RBS is entitled to assert such evidence in the form of a motion for summary judgment to renew its challenge to Ridgeway's claim of negligent misrepresentation.

Lastly, as discussed in the context of Ridgeway's claim of promissory estoppel, he has clearly alleged that he relied on RBS/Hewitt's representation that he was entitled to sixteen weeks of protected medical leave.  On the basis of Hewitt's confirmation of his entitlement to FMLA and CTFMLA leave between January 1, 2010 and April 22, 2010, Ridgeway scheduled and underwent surgery and took leave from his employment with RBS to recover, ultimately suffering a termination of his employment on April 22, 2010. Further, Ridgeway alleges that as a result of his reliance on RBS's misrepresentation, he has suffered lost compensation, seniority, benefits and other rights, privileges, and conditions of employment.

Accordingly, Ridgeway has plausibly alleged a claim of negligent misrepresentation. RBS's motion to dismiss Ridgeway's claim of negligent misrepresentation is DENIED.

IV.     Conclusion

Based upon the above reasoning, RBS's motion to dismiss is GRANTED in part and DENIED in part. The motion to dismiss is granted as to claim two, alleging wrongful termination, and claim three, alleging a violation of Conn. Gen. Stat. §31-51q. The motion to dismiss is denied as to claim one, asserting both interference and retaliation in violation of the FMLA, claim four for promissory estoppel, and claim five for negligent misrepresentation.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 26, 2012