bUNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LOUIS RIDGEWAY, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:11-cv-976 (VLB) |
| | : | |
| ROYAL BANK OF SCOTLAND GROUP and | : | |
| RBS GLOBAL BANKING AND MARKETS, | : | |
| Defendants. | : | May 13, 2013 |

**MEMORANDUM OF DECISION DENYING DEFENDANT'S [DKT. #64] MOTION TO
WITHDRAW JUDICIAL ADMISSIONS, DENYING IN PART AND GRANTING IN PART
DEFENDANTS' [DKT. #65] MOTION FOR SUMMARY JUDGMENT, AND DENYING
[DKT.# 104] PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

Plaintiff Louis Ridgeway ("Ridgeway") brings this action for damages
against the Defendant Royal Bank of Scotland Group and its subsidiary RBS
Global Banking and Markets (referred herein as "RBS") relating to his termination
from RBS after having been on leave for medical treatment.  Pending before the
Court is RBS's motion to withdraw two judicial admissions under Fed. R. Civ. P.
36(b) and its motion for summary judgment on Ridgeway's Family and Medical
Leave Act claims, 29 U.S.C. §2601 *et seq.* ("FMLA"), promissory estoppel and
negligent misrepresentation claims as well as  Ridgeway's cross- motion for
summary judgment on these claims.1  For the following reasons, the Court

---

1 Ridgeway's promissory estoppel and negligent misrepresentation claims are
also predicated on Ridgeway's assertion that he was provided with
misinformation regarding both the Federal FMLA and Connecticut's Family and
Medical Leave Act ("CTFMLA").  The present action does not contain a claim
under the CTFMLA as there is an exhaustion of administrative remedies
prerequisite to bringing a CTFMLA action.  Ridgewayis  in the process of
exhausting those administrative remedies as the Connecticut Department of
Labor is currently investigating his complaint that RBS violated the CTFMLA.

denies RBS's motion to withdraw two judicial admissions, denies in part and grants in part RBS's motion for summary judgment and denies Ridgeway's cross-motion for summary judgment.

<u>Facts</u>

The following facts are undisputed unless otherwise noted.  In 2008, RBS acquired ABN AMRO where Ridgeway was employed.  [Dkt. #65, Def. Local Rule 56(a)1 Statement, ¶2].  At that time, Ridgeway began working in RBS's Global Banking & Markets ("GBM") offices, a subsidiary of RBS, as a secondee.  *Id.* at ¶¶2-3.  RBS gave secondees, such as Ridgeway, credit for their service with their prior employer to satisfy eligibility criteria for benefits, including FMLA leave.  *Id.* at ¶6.  As a secondee, Ridgeway received GBM's employment policies in 2008.  *Id.* at ¶7.  On June 22, 2009, Ridgeway received a letter offering him employment effective July 13, 2009.  *Id.* at ¶9.  The letter informed Ridgeway that "you will have access to all of our policies and procedures when you join us on the Group's intranet or from your line manager [and that] [y]ou must familiarize yourself with them and you agree to be bound by them."  *Id.* at ¶10.   Ridgeway was an at-will employee.  *Id.* at ¶¶11-12.

GBM's FMLA policy, which was maintained on its employee intranet website, stated: "[e]ligible employees may take up to 12 weeks of leave during a rolling 12-month period. A rolling 12-month period is measured backward from the date an employee uses any leave under this policy. Employees who have been on FMLA leave for their own serious health condition and whose FMLA leave expires while they remain out of work during a continuing approves

disability period will no longer have job protection…Once the employee has been medically cleared to return to work and provides a release from their doctor, they will have 45 days to secure another position within the Company…Employees who have not found a position within 45 days of their release to return to work will be considered as having terminated their employment." *Id.* at ¶14.  RBS's personnel manual states, "this policy provides guidance and may not be relied upon by employees as establishing any particular terms and conditions of employment.  This policy is not intended as and does not create, either expressly or by implication an employment agreement.  Any policy of RBS is subject to change at any time at the sole discretion of RBS."  [Dkt. #105, Pl. Local Rule 56(a)1 Statement, ¶31].  GBM always was, and continues to be, on a rolling 12 month period for FMLA calculation and therefore never changed its policy during the relevant time period.  [Dkt. #65, Def. Local Rule 56(a)1 Statement, ¶16].  Other RBS subsidiaries for which Ridgeway never worked changed from a calendar method to a rolling method in January 2010. *Id.* at ¶17.   Ridgeway had access to these policies while he was employed at GBM.  *Id.* at ¶19.

Hewitt LLC ("Hewitt") is a third-party which administers RBS's (including GBM's) leave policies.  *Id.* at ¶22.  Employees can contact Hewitt through an 800 number which connects to RBS's HR Shared Services in Rhode Island.  *Id.* at ¶24.  The contract between Hewitt and RBS provides that employees contact Hewitt via phone to initiate FMLA leave.  [Dkt. #106, Ex. 4, at Bates JL003152].  Hewitt "verifies employee's eligibility, any applicable state laws, and if the request is for a qualifying reasons."  *Id.*  Hewitt then "sends FMLA confirmation letter with CHP

form to employee." *Id.* Hewitt "notifies client designee vie email of the employee intent to take leave" and "employee returns completed CHP form" to Hewitt for "approval/denial." *Id.* Hewitt will also "review request for both continuous and intermittent leave" and will send "FMLA approval or denial letter to employee." *Id.* When an employee has exhausted his job protection, a GBM HR Business Partner, not Hewitt, will send a letter directly to the employee informing him or her of this. [Dkt. #65, Def. Local Rule 56(a)1 Statement, ¶25]. When RBS employees call the HR Service Center, they are instructed to choose an option for their inquiry, and once they select the prompt for medical leave, employees are directly connected to Hewitt. [Dkt. #105, PL. Local Rule 56(a)1 Statement, ¶29]. RBS's FMLA policy in its personnel manual states that "policy questions should be addressed to employees' managers or to the HR Service Center." *Id.* at ¶32.

In May 2009, Ridgeway had gallbladder surgery, which required him to take medical leave. *Id.* at ¶35. Ridgeway requested and was granted a leave of absence under the FMLA and the CT FMLA. *Id.* at ¶36. Hewitt confirmed its approval of this request in a letter on RBS letterhead dated May 20, 2009. The letter stated: "[t]his confirms that Leave Administration has received your request for a family or medical leave of absence from 5/14/2009. We have conditionally designated your leave as taken under the federal Family and Medical Leave Act and/or applicable state leave(s), subject to review and approval of required documentation. You are also eligible for short term disability (STD). If your STD application is approved, your FMLA and/or applicable state leave(s) will be automatically approved as authorized FMLA and/or applicable state leave(s)… if

your leave is approved as authorized FMLA and/or applicable state leave(s), it will be classified under the federal Family and Medical Leave Act (FMLA) FMLA and/or applicable state leave(s) law(s) and your time off from work will reduce your available FMLA and/or applicable state leave(s) balances." [Dkt. #106, Ex. 12]. The letter further states that "[u]nder RBS's FMLA leave policy colleagues can take up to 12 weeks of unpaid, job-protected leave in a calendar year for certain qualifying reasons if they have been employed for at least 12 months and have worked 1,000 hours during the preceding 12 month period." *Id.* The letter provided that if your "leave is approved as authorized FMLA and/or applicable state leave(s), you job will be protected under the FMLA and/or applicable state leave(s)… If you return to work before job protection ends, you will be entitled to be reinstated to the same or an equivalent job (with the same pay, benefits, and conditions of employment) as if you had never gone on leave." *Id.*

Lastly, the letter contained an attached document which instructed employees to complete five steps to apply for a leave of absence. Step One: an employee must review RBS's applicable leave of absence policies; Step Two: call Leave Administration to initiate your leave; Step Three: notify your manage of your need for a leave; Step Four: if your STD application is denied in full or part, you or your health care provider must send Leave Administration a completed Health Care provider Certification Form; and Step Five: contact your manager and your Human Resources Generalist and Leave Administration to confirm any changes to your leave of absence. *Id.* The Parties dispute whether Ridgeway followed the five steps. RBS contends that Ridgeway never went onto the RBS

intranet to look for the leave policy.  [Dkt. #65, Def. Local Rule 56(a)1 Statement, ¶34].  Ridgeway denies that he skipped Step One and avers that he reviewed the policy with a Hewitt representative because they would have the most up to date information but did not go online.  [Dkt. #118, Pl. Local Rule 56(a)2 Statement, ¶34].  Ridgeway contends that he was also incapable of reviewing the policies with his manager Koren Horsey as she has testified that she never read the policy, discarded the policies sent to her and never referred to the internal website.  *Id.*

On October 5, 2009, Ridgeway fell at work and shortly thereafter contacted RBS to request medical leave.  [Dkt. #105, PL. Local Rule 56(a)1 Statement, ¶¶38-39].  Ridgeway received a letter, dated October 13, 2009, from Hewitt on RBS letterhead confirming that "Leave Administration ha[d] received [his] request for family or medical leave of absence from 10/6/2009."  [Dkt. #106, Ex. 13].   The letter stated that "[w]e have conditionally designated your leave as leave taken under the federal Family and Medical Leave Act and/or applicable state leave(s), subject to review and approval of required documentation."  *Id.*  Again, the letter stated that "[u]nder RBS's FMLA leave policy colleagues can take up to 12 weeks of unpaid, job-protected leave in a calendar year for certain qualifying reasons if they have been employed for at least 12 months and have worked 1,000 hours during the preceding 12 month period."  *Id.*  The letter again provided that if your "leave is approved as authorized FMLA and/or applicable state leave(s), you job will be protected under the FMLA and/or applicable state leave(s)… If you return to work before job protection ends, you will be entitled to be reinstated to the

same or an equivalent job (with the same pay, benefits, and conditions of employment) as if you had never gone on leave." *Id.* The letter further explained that three days prior to Ridgeway's expected return to work, he would be "contacted by a Return to Work Advocate to confirm" he would be returning as scheduled. *Id.* The letter indicated that if Ridgeway had not heard from a Return to Work advocate within three days prior to his anticipated return to work date, he should call an 888 number to discuss his return to work options with a Return to Work Advocate. *Id.* The letter provided that "[i]f you have any questions about your leave of absence, contact Leave Administration" and choose the prompt for Leave of Absence. *Id.* The letter also contained the same attached document outlining the five steps an employee should complete to apply for a leave of absence.

At the end of October 2009, Ridgeway consulted with doctors regarding undergoing spinal surgery. The parties dispute whether this surgery was medically necessary at that time or was elective and could be postponed. Ridgeway's surgeon, John Bendo, M.D., declared in an affidavit that "Mr. Ridgeway was referred to me in December 2009 to determine whether he was an appropriate candidate for spinal surgery based on his back and neck injuries." [Dkt. #106, Ex. 15. Bendo Aff., ¶2]. Dr. Bendo stated that "[a]fter evaluating Mr. Ridgeway, I informed him that spinal surgery could help to alleviate his neck pain. I discussed the risks and benefits of the surgery with Mr. Ridgeway. And he elected to have the surgery." *Id.* at ¶¶3-4. Dr. Bendo declared that in his professional opinion, he "did not believe that the surgery was required at that

point, nor did [he] believe that it would become medically necessary at any later point." *Id.* at ¶5.2   Dr. Bendo informed Ridgeway that he had an opening on December 3, 2009 to perform the surgery but that "he could cancel the surgery if he did not receive authorization to take job-protected medical leave."3 *Id.* at ¶¶7-8.

Ridgeway declared in an affidavit that "[b]ased on the medical advice, I received from my doctors in the fall of 2009, I understood that spinal surgery was elective.  It was only necessary to the extent I wanted to alleviate my symptoms." [Dkt. #106, Ex. 14. Ridgeway Aff., ¶1].  Ridgeway testified in his deposition that another Doctor, Dr. Baron, upon review of his MRI, stated "that I might need surgery in his opinion and gave me the name of some surgeons to see.  I did not know those surgeons, so I saw my own surgeon, Dr. Bendo."  [Dkt. #106, Ex. 2, Ridgeway Dep., p. 89].  Ridgeway further testified that when he met with Dr.

---

2 **RBS objects to this portion of Dr. Bendo's affidavit arguing that Dr. Bendo's opinion was "unsupported by any contemporaneous notes regarding Mr. Ridgeway" and cannot be considered as it contains conclusory allegations, opinions, argument and legal conclusions which are prohibited in affidavits in support of or opposition to summary judgment motions.  [Dkt. #116, Def. Mem., p.21] (citing *Lachira v. Sutton*, No.3:05-cv-1585(PCD), 2007 WL 1346913, at *4-5 (D. Conn. May 7, 2007)).  RBS correctly points out that conclusory statements and legal conclusions are prohibited in affidavits supporting or opposing summary judgment, however, Dr. Bendo's expert opinion as to the medical necessity of the surgery is neither conclusory nor a legal conclusion, but testimony well within his knowledge and expertise and clearly based on his contemporaneous medical evaluation and treatment of Ridgeway despite the fact that Dr. Bendo did not record this opinion in a treatment note.  Further, the case that RBS relies on is not relevant as the *Lachira* court struck generalized and conclusory statements made in the plaintiff's own affidavit as opposed to statements made in a medical expert's affidavit.**

3 **RBS objects to this portion of Dr. Bendo's affidavit as inadmissible hearsay. However, Dr. Bendo's testimony that he told Ridgeway that he could cancel the surgery is not hearsay because it is not offered to establish that Ridgeway's surgery could be cancelled, but rather to show Ridgeway's state of mind.**

Bendo they discussed the options available to him which were to "wait and see, have some physical therapy, see if it got better, possibilities of surgery, the whole situation from the wait-and—see through surgery."  *Id.* at 90.

RBS points out that Ridgeway alleges in his complaint that "[a]fter completing a course of physical therapy during October and November of 2009, Ridgeway's doctor informed him that his neck and back injury required surgery." [Dkt. #1, Compl., ¶23].  Ridgeway also alleged that "[o]n or about December 1, 2009, Ridgeway was informed that his orthopedic surgeon had an opening to perform the surgery he needed on December 3, 2009."  *Id.* at ¶24.  "On a motion for summary judgment, however, allegations in an unverified complaint cannot be considered as evidence."  *Continental Ins. Co. v. Atlantic Cas. Ins. Co.*, No.07Civ.3635(DC), 2009 WL 1564144, at *1n.1 (S.D.N.Y. June 4, 2009) (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).  The Court will therefore not rely on any disputed allegations not supported by evidentiary materials.

RBS also points to Ridgeway's representations that he requested leave to "undergo necessary neck surgery" to the Connecticut Department of Labor regarding his CT FMLA claim.  [Dkt. #65, RSB Local Rule 56(a)1 Statement, ¶38 and RBS Ex. 36 – manually filed].  In addition, Ridgeway stated in a June 30, 2010 appeal of the denial of an extension of his short-term disability that he "needed cervical fusion surgery."  [Dkt. #65, RSB Local Rule 56(a)1 Statement, ¶39 and RBS Ex. 33 – manually filed].  In a taped phone call on November 27, 2009, Ridgeway told RBS Shared Service: "I had an intermediate approval [for STD

benefits] as I was going to see a surgeon and then the surgeon dictated surgery was needed."  [Dkt. #65, RSB Local Rule 56(a)1 Statement, ¶40].

On or about November 18, 2009, Ridgeway contacted Hewitt regarding additional medical leave.  A summary of the communications between Ridgeway and Hewitt produced by Hewitt (the "Timeline") indicates that on November 18, 2009, Ridgeway "called to advise extension [of medical leave] needed."  [Dkt. #106,  Ex. 17, Hewitt Timeline].4  The Timeline further provided that on November 24, 2009, Short Term Disability ("STD") "extension approved by Liberty Mutual" and that there was approval of disability through 12/03/09.  *Id.*  On November 25, 2009, "Leave approval noticed mailed, Approval DC sent and STD w/ FMLA and or State Leave approval email sent."  *Id.*

Ridgeway called Hewitt on December 1, 2009 inquiring about further medical leave.  Hewitt recorded this call with Ridgeway.  However when RBS contacted Hewitt to obtain a copy of the recording during the course of this litigation, Hewitt informed RBS that it no longer had a copy of this recording or any recording between Plaintiff and its representative. [Dkt. #63, RBS Mem., p.2].

---

4 **Hewitt produced two different Timelines regarding Ridgeway's communications with them which the Court has reviewed.  Where the Timelines have differed the Court has included both accounts in its statement of undisputed facts.  *See* [Dkt. #106, Exs. 16-17].  Although the Defendant has not established a foundation that these Timelines fall within the hearsay exception for records of regularly conducted activity, it appears these Timelines fall squarely within that exception as the Timelines reflect information transmitted by someone with knowledge, kept in the course of regularly conducted activity, and maintaining such records appear to be the regular activity of the company to create and maintain contemporaneous summaries of its claim processing activities.  Fed. R. Evid. 803(6).  Further as Ridgeway has not objected to the admissibility of the Timelines, the Court deems them admissible.**

In response to Ridgeway's requests to admit regarding the December 1 call, RBS admitted that (1) "[i]n the conversation with Hewitt Associates on or about December 1, 2009, Hewitt granted Ridgeway's FMLA leave to begin on January 1, 2010" and (2) "[i]n December of 2009, Hewitt granted Ridgeway an FMLA leave to begin on January 1, 2010 and to run for twelve weeks." *See* [Dkt. #64, Def. Mot. to Withdraw, p. 2-3]. RBS indicated that it made this admission on the basis of one of Hewitt's Timelines in addition to the recollection of HR professionals who spoke with Hewitt representatives. RBS has subsequently filed a motion to withdraw these admissions, which is currently pending before the Court, on the basis of the summaries of this conversation as provided in the Timelines and on the basis of an email summary of the recording by a Hewitt employee who had listened to the recording of the call. RBS argues these summaries made clear that Hewitt only advised Ridgeway that his CT FMLA would refresh in January 2010 and not his FMLA. RBS argues that this additional evidence proves that Ridgeway was never provided with incorrect information regarding his federal FMLA entitlement.

Hewitt's Timeline provided that that on December 1, 2009 Ridgeway "called, representative advised colleague of his FMLA exhaustion and advised state leave eligible through end of year, and advised that state leave renews in 2010." *Id.* 5 Ridgeway testified that on December 1, 2009, he called HR Services to "verify my FMLA [] protection." [Dkt. #106, Ex. 2, Ridgeway Dep., p. 104]. Ridgeway

---

5 **The other Timeline Hewitt provided indicated that on December 1, 2009: "Colleague called in. Advice about FMLA exhaustion and advice about state leave eligible thru the end of the year and renews in 2010." [Dkt. #106, Ex. 16]. On 12/07/2009, "Comments: FMLA exhausted 12/4/09, EE will remain on STD thru 1/27/2010 and statute until 12/31/2009."** *Id.*

testified that on December 1, 2009 he spoke with Eddie, a Hewitt representative, and that "basically it was calling to see about FMLA coverage because I had surgery scheduled, as I was told by the HR service representative I was covered through FMLA and it renewed in January 2010.  So I would have FMLA coverage through April of 2010."  *Id.* at 110-113.  Ridgeway further testified that he did not recall discussing Connecticut FMLA during this call.  *Id.* at 113.  Ridgeway explained that "I called the RBS HR Services to look into my FMLA coverage because I had surgery scheduled.  I was speaking with Eddie and he looked at my ID, my policy, the RBS policy, and he looked through everything and he said that I was covered and the RBS – I don't recall if he said FMLA or CTFMLA, Federal or Connecticut, as to which one or he may have stated both, I'm not sure, I don't recall that, [he] said I was covered through April 2010."  *Id.* at 114.  Ridgeway testified he believed Eddie told him that he was covered through "around April 22, 23, 24, that time range."  *Id.*  Ridgeway declared that "I can't tell you verbatim but I did ask about job protection…[and] [h]e said I was covered under FMLA and I had a job protection basically… through April 2010."  *Id.* at 115.  Ridgeway further testified that he believed that he discussed with Eddie that his FMLA had expired because of the May and October leaves but that he was told that he was "still covered" because "it renewed in January 2010, so coverage would go straight through."  *Id.* at 117-118.  He testified that "Eddie told me it refreshes on an even year.  I believe it happened in that conversation, it renewed on even years and 2010 it would renew.  *Id.* at 122-123.  Ridgeway testified several times during

his deposition that he did not recall any distinction at all about the discussion between the FMLA and CT FMLA.  *Id.* at 115-116, 118.

On December 3, 2009, Ridgeway went forward with his surgery.  [Dkt. #106, Ex. 2, Ridgeway Dep., p. 123-24].  In a letter dated December 14, 2009, Hewitt on RBS letterhead informed Ridgeway that his "request for a leave of absence has been approved" and that his leave would be "classified as a leave under the Family and Medical Leave Act (FMLA) and/or applicable state leave(s).  All time taken during your leave will be counted towards any FMLA and/or applicable state leave(s)."  [Dkt. #106, Ex. 22].  The letter further indicated that Ridgeway's request for "[c]ontinuous leave has been approved from 10/6/2009 to 12/31/2009."  *Id.*  The letter further indicated that when Ridgeway's leave ended, he would have "taken 480 hours (12 weeks of FMLA entitlement.  That time will count against [his] twelve week entitlement (in addition to any FMLA [] already used during this 12-month period)."  *Id.*

In a letter dated December 15, 2009 on RBS letterhead, Hewitt "confirm[ed] that Ridgeway's family medical leave of absence has been approved from 10/6/2009 to 12/31/2009."  [Dkt. #106, Ex. 23].  Again they informed Ridgeway that when the leave ends, "you will have taken 480 hours (12 weeks) of FMLA entitlement.  That time will count against your 12-week entitlement (in addition to any FMLA you have already used during this 12-month period)."  *Id.*

Around the end of January 2010, Ridgeway received a letter dated January 25, 2010 from Dawn Hughes, a RBS Human Resources representative, which stated that the "purpose of his letter is to provide you with important information

regarding your employment status.  Your Family Medical Leave allowance has exhausted as of January 1, 2010 and your position as a Senior Operations Analyst has been put into the posting process / is no longer available.   Please note your employment will remain in force so long as your Disability claim is approved.  Should you have any questions, please feel free to contact HR Services at 888-394-9675." [Dkt. #106, Ex. 24].  RBS contends that Ridgeway should have called the 888 number provided for a Return to Work advocate in Hughes's letter or called Hughes directly but instead chose to call the HR Service Center, which was manned by Hewitt Representatives.  [Dkt. #65, RBS Local Rule 56(a)(1) Statement, ¶¶56-62].6

On February 17, 2010, Ridgeway contacted the HR Service Center. Ridgeway testified that "I called RBS HR Services about the letter I received from Dawn Hughes.  I was told this letter was incorrect, that I was covered under the Medical Leave and that I was covered through April.  I believe I asked them to contact Dawn Hughes and I believe I was told they would contact Dawn Hughes and inform her of this… we spoke about the job protection.  I asked about that since she said the job was gone.  They said since I was covered under the policy, that I still had my job, my job protection was in tact." [Dkt. #106, Ex. 2, Ridgeway Dep., p. 140-141, 148-49, 150-51].  Hewitt's Timeline indicated that Ridgeway

---

6 **RBS repeatedly stresses that Ridgeway failed to call the number provided in Hughes's letter and instead called Hewitt through the HR Service Center in its motion for summary judgment.  However, it is unclear how this fact relates to any of Ridgeway's claims at issue.  It was not unreasonable for Ridgeway to contact Hewitt at the HR Service Center in February after receiving Hughes's letter to confirm its previous statement that he had medical leave eligibility and in light of the fact that RBS's FMLA policy instructs that policy questions be addressed to the HR Service Center.**

"called to inquire on job protection" on February 17, 2010. [Dkt. #106, Ex. 17].

The Timeline provided a call summary which indicated:

> Mr. Ridgeway contacted Leave Admin to verify a letter he received from Liberty mutual, he wanted to know when STD ends, and the call taker confirmed he was approved at that time through 2/25/2013 for STD.  He wanted to know when his 26 weeks would end, the represented advised we do not have that information he would need to speak with Liberty Mutual. He said he spoke with RBS and was told that everything would start over at the beginning of the year and wanted to know if there was a difference between their policy (Liberty Mutual) and our policy, the representative advised there is a difference between STD and job protection the representative advised it is job protection that would refresh at the beginning of the year, not STD.   Mr. Ridgeway then had a question if his STD turns into LTD is he still guaranteed a position within the company. The representative advised STD and LTD had nothing to do with job protection and advised he was eligible for job protection to 4/22/2010 and after that date RBS was no longer required to hold his position.

*Id.*

In early April 2010, Ridgeway received a letter dated March 31, 2010 from

Hewitt on RBS letterhead stating that "[t]his confirms that Leave Administration

has received your request for a family or medical leave of absence from

1/1/2010." [Dkt. #106, Ex. 26].   The letter further provided that "[w]e have

conditionally designated your leave as leave taken under the federal Family and

Medical Leave Act (FMLA) and/or applicable state leave(s), subject to review and

approval of the enclosed Health care Provider Certification form, Leave

Administration will notify you by letter when a determination has been made.  If

your leave is approved as authorized FMLA and/or applicable state leave(s), it will

be classified under the federal Family and Medical Leave Act (FMLA) and/or

applicable state leave(s) law(s) and your time off from work will reduce your

available FMLA and/or state family medical leave(s) balances."  *Id.*  The letter for

the first time stated that "[u]nder RBS's FMLA leave policy colleagues can take

up to 12 weeks of unpaid, job-protected leave in a rolling backward twelve month period for certain qualifying reasons if they have been employed for at least 12 months and have worked 1000 hours during the preceding 12 month period." *Id.* The letter further explained that three days prior to Ridgeway's expected return to work, he would be "contacted by a Return to Work Advocate to confirm" he would be returning as scheduled. *Id.*   The letter indicated that if Ridgeway had not heard from a Return to Work advocate within three days prior to his anticipated return to work date, he should call an 888 number to discuss his return to work options with a Return to Work Advocate.  *Id.*  Lastly, the letter indicated that "[i]f you have any questions about your leave of absence, contact Leave Administration" and choose the prompt for Leave of Absence.  *Id.*  In addition, this letter also contained the same attached document outlining the five steps an employee should complete to apply for a leave of absence.  *Id.*

On April 5, 2010, Ridgeway contacted the HR Service Center again. Hewitt's Timeline provides that on April 5, 2010, a "Leave case manager commented [Ridgeway] is not FMLA eligible but state leave eligible as state does refresh every 24 months on a calendar year.  FLMA closed and waiting for instructions from unit manager to close the leave and possible process a closed DC."  [Dkt. #106, Ex. 17].  The other Hewitt Timeline provides that on April 5, 2010, "Out Bound Call to advise colleague that he is STATE eligible...not FMLA eligible…initiated proper leave.  Colleague is not FMLA eligible BUT he is STATE eligible as STATE does refresh every 24 months on a calendar year… FMLA closed and awaiting instruction from DORI to close the leave and possibly

process a closed DC."  [Dkt. #106, Ex. 16] (emphasis in the original).  On April 6, 2010, the Timeline indicated that "FMLA closed due to not eligible.  State Leave.  Pending DC sent for state leave.  Confirmation of FMLA and/or applicable state leave sent.  FLMA or applicable state leave application notice email sent." [Dkt. #106, Ex. 17].

Ridgeway then received a letter dated April 7, 2010 from Hewitt on RBS letterhead stating that "[t]his confirms that Leave Administration has received your request for a family or medical leave of absence from 1/1/2010.  We have conditionally designated your leave as leave taken under the federal Family and Medical Leave Act (FMLA) and/or applicable state leave(s), subject to review and approval of the enclosed Health Care provider Certification form.  Leave Administration will notify you by letter when a determination has been made." [Dkt. #106, Ex. 27].  The letter again provided that "[i]f your leave is approved as authorized FMLA and/or applicable state leave(s), it will be classified under the federal Family and Medical Leave Act (FMLA) and/or applicable state leave(s) law(s) and your time off from work will reduce your available FMLA and/or state family medical leave(s) balances."  *Id.*  The letter also stated that "[u]nder RBS's FMLA leave policy colleagues can take up to 12 weeks of unpaid, job-protected leave in a rolling backward twelve month period for certain qualifying reasons if they have been employed for at least 12 months and have worked 1000 hours during the preceding 12 month period."  *Id.*  The letter further explained that three days prior to Ridgeway's expected return to work, he would be "contacted by a Return to Work Advocate to confirm" he would be returning as scheduled. *Id.*

The letter indicated that if Ridgeway had not heard from a Return to Work advocate within three days prior to his anticipated return to work date, he should call an 888 number to discuss his return to work options with a Return to Work Advocate.  *Id.*  Lastly, the letter indicated that "[i]f you have any questions about your leave of absence, contact Leave Administration" and choose the prompt for Leave of Absence.  *Id.*  Again, the letter contained the same attached document outlining the five steps an employee should complete to apply for a leave of absence.  *Id.*

On April 9, 2010, Ridgeway contacted Dawn Hughes.  During this call, Hughes learned for the first time about Ridgeway's December 1 call with Hewitt and that Ridgeway believed he was on job-protected leave on the basis of his communications with Hewitt.  [Dkt.# 65, RBS Local Rule 56(a)1 Statement, ¶60; Hughes Dep., p.86-87].  Ridgway also called the HR Service Center that same day.  Hewitt's Timeline provides that on April 5, 2010, Ridgeway "called to confirm he was state eligible.  Call taker advised colleague he is state leave eligible and went over process.  [Ridgeway] advised he would have forms sent to Leave Admin ASAP.  [Ridgeway] also advised Dawn Hughes contacted him from RBS to advise that he is not eligible for any leave.  Leave Admin advised [Ridgeway] we will confirm and if there is any further information we would let him know."  [Dkt. #106, Ex. 17].

On April 13, 2013, Ridgeway called the HR Service Center again and left a message.  The Timeline provides that Hewitt employees were instructed on April 13, 2013 that if Ridgeway calls back "DO NOT ADVISE ON CT FMLA – Provide the

following: We are currently working with RBS/GBM to review CT FMLA and discussing with them internally once we have received follow up from RBS/GB (24-48 hrs) we will contact to advise.  Again do not provide any information except what is listed above."  [Dkt.#106, Ex. 16] (emphasis in the original).  The Timeline indicated that Ridgeway did call back on April 13, 2010 and "wanted [Hewitt] to provide him with information based on a hypothetical, [Hewitt] advised again that [they were] unable to provide any additional information other than what [was] provided and as soon as [they] have received the follow up from RBS/GBM he will be contacted."  *Id.* Later that day, the Timeline provides that Ridgeway called again and was "advised that he has always been in rolling 12 month tracking method and that state is under review."  *Id.*

On April 13, 2010, Ridgeway also contacted the Connecticut Department of labor ("CTDOL") regarding his medical leave.  [Dkt. #105, Pl. Local Rule 56(a)1 Statement, ¶84].  On April 14, 2010, the CTDOL contacted RBS.  *Id.* at ¶89.

On April 15, 2010, RBS communicated to Hewitt that "CT state leave will be calculated using the rolling back method.  State leave will be denied and a denial letter sent."  [Dkt.#106, Ex. 16].  Hewitt called Ridgeway to advise him "per the client, CT FMLA will be calculated using the rolling back method just as his federal FMLA is calculated.  The state leave will be denied and a denial letter will be sent within the next 24-48 business hours."  *Id.*  The Timeline also indicates that Hewitt advised Ridgeway to follow up with Dawn Hughes at RBS.  *Id.*

On April 16, 2013, Ridgeway called Hewitt and spoke with Ebonie Henry a Project Manager at Hewitt.  Ridgeway recorded this April 16, 2013 phone call and

provided the court with a transcript of the call.  [Dkt. #106, Ex. 20].  The call transcript provides that Ridgeway informs Ebonie that he spoke with Yvonne last night and Brenda this morning and that "[n]either one told me anything specific other than my FMLA was denied.  I asked about policy.  No one will speak to me about anything else."  *Id.*  Ebonie replies that "RBS did get back with us to advise us that the Connecticut FMLA will be treated just as the Federal FMLA, which is going to be calculated on a rolling back, not a calendar year.  So based on that being calculated as a rolling back, you did not have any entitlement available to you."  *Id.*   Ridgeway asks "everyone else I've spoken to: Eddie, Caroline, everyone else was incorrect as to what they stated?"  *Id.*  Ebonie tells Ridgeway that "[t]hat information was incorrect based on what we currently have on file.  But we verified with RBS that it is actually on a rolling back period to match the Federal."  *Id.*   Ebonie explains that Ridgeway was provided with incorrect information and what happened "was once we sent the information over [to RBS], we received notification back that based on the population that you are under for RBS, the state FMLA would be rolling back.  So that's what we had to confirm with RBS…Because there were several policy changes within the last 12 months for RBS.  So the information we had at that time was based on – we were previously calendar year.  RBS did confirm no, that this population is rolling back."  *Id.*   Ebonie further explains that "when the state information was entered to us [from RBS], it wasn't changed, it didn't show that it would mirror, basically the Federal FMLA information... we did not have the information [that Ridgeway's population was calculated on a rolling back basis] in our system."  *Id.*

Ridgeway called Ebonie again on April 16, 2010 and recorded that second conversation.  Ridgeway asked if Ebonie can see the notes of his prior conversation with Hewitt back in November or December.  [Dkt. #106, Ex. 19]. Ebonie informed him that she can "look at" and "review" the calls for him.  *Id.* Ridgeway tells Ebonie he spoke with Dawn Huges who told him that "my FMLA expired in December, and unless I can produce to her that I was told prior to the end of December, I basically had 45 days to find a job, if not I will be terminated. Now, if I can produce to her something stating that, they may reconsider my termination and find me a position.  But I need to show her something."  *Id.* Ebonie tells Ridgeway that she cannot listen to the recorded calls with him but she can listen to the call and then "provide that information over."  *Id.*  Ebonie tells Ridgeway that she will listen to the call and follow up with Dawn Huges but that she cannot provide Ridgeway with a synopsis of the call directly.  *Id.*

Ebonie sent Dawn Hughes an email regarding the phone conversations she had with Ridgeway on April 16, 2010.  [Dkt. #106, Ex. 18].  Ebonie wrote in the email that "I want to provide you with follow [up] on my 2 conversations with Louis Ridgeway.  I spoke with Mr. Ridgeway this morning in which I advised him CT FMLA is calculated using the rolling back method, I explained to him the miscommunication of the information by our department in which he was advised it was calculated on a calendar year.  Mr. Ridgeway did state on the call that had he been made aware that he wouldn't have job protection he may have been able to convince his docter to allow him to return to work, he wanted to know what would happen to his employment status due to the miscommunication of

information.  I advised him to follow up with you to discuss employment status going forward." *Id.*  Ebonie further informed that "Mr. Ridgeway called back at approximately 11:30am and advised that he had spoken with you and you advised him that if he can find proof that he was told by Leave Administration prior to January 2010 that his CT FMLA would refresh in 2010 his employment status may be reconsidered, otherwise he would have 45 days to find a new job.  I confirmed we did speak with him on 12/1/2009 in reference to his FMLA and State FMLA entitlement, I would listen to the call and provide you with the information [once] it was reviewed.  He asked to listen to the call I advised him we could not listen to the call together, he then asked for a synopsis of the call I advised that other than what I had told him above I couldn't discuss the call any further, however, I would provide you with the information and let him know when I sent the information to you for follow up.  Mr. Ridgeway also attempted to get me to say since he was advised that he did have job protection beginning in January 2010 he should have felt that he didn't have anything to worry about – I advised him that I could not speak to how he should have felt based on the conversation, but could advise that an entitlement conversation did take place at that time.  I have listened to the 12/1/2009 incoming call from Ridgeway in which he spoke with one of our representative, the representative did advise him on the call that his CT FMLA would refresh in January 2010, he would have the full 16 weeks of entitlement and therefore would have job protection." *Id.*

Ridgeway then called Ebonie back a third time on April 16, 2010.   Ebonie emailed Dawn Hughes regarding that third call.  Ebonie informed Dawn Hughes

that Ridgeway told her that he "would no longer have a position within RBS in 45 days and he did not think that it was fair based on him receiving incorrect information, he also stated that you advised if the information he received in the letter was incorrect he did not call to say the information was incorrect.  He stated that he called the Leave Administration department and wanted to know if he had leave or FMLA question he should call our department.  I advised Leave Administration is the correct department to call in regards to leave policy i.e. FMLA, however if he received a letter and it advises otherwise he should follow those instructions or if he has any questions on employment status, termination surrounding return to work he needs to speak with RTW advocates."  *Id.*  Ebonie sent one last email to Dawn Hughes on April 16, 2010 stating that "[a]s we discussed on the phone call today, we will refer Mr. Ridgeway directly to you should he contact Leave Administration to keep the conversation consistent."  Ebonie in the email also provided Hughes with the summary of the 2/17/2010 phone call Ridgeway had with Hewitt in which he was told that because state leave refreshed he had job protection until April.

Ridgeway left Hughes a voicemail in April 2010 in which he stated that "I just spoke with Ebony who verified and she will be sending you information, she verified that on December 1, 2009 I called the leave administration asking about FMLA and CT state FMLA leave and renewing and she stated that based on the information that everyone was using I would have been advised that on this December 1 call that CT FMLA would renew on January 1."  [Dkt. #89, Ex. L, MP Decl., ¶14d].

On April 19, 2010, Ridgeway spoke with Dawn Hughes and recorded that conversation.  Dawn Hughes tells Ridgeway "there's a few things to clarify.  One is, the letter that was sent to you in January which confirmed that your Connecticut job – under the state of Connecticut – that job protection is exhausted, is in fact the case.  I know that there was some confusion when you were talking to Leave Administration as to when the FMLA days get renewed... There was uncertainty given to you through Leave Administration, in which I've clarified and it's unfortunate that you were given false hope, but nonetheless, we do, in fact, manage to the rolling calendar." [Dkt. #106, Ex. 29].  Dawn Hughes further explains to Ridgeway that "usually what happens in other cases similar to this is, you can actually look for a new job within the firm for a period of up to 45 days.  I'm happy to pass you on the job websites, and there will be that grace period for you to look for a new job within the firm.  But there is no guarantees around your particular job because that job protection was exhausted...your job protection was exhausted in December." *Id.*

On April 22, 2010, Ridgeway had a conference call with Hughes and Ronnie Greenberg another representative In RBS's Human Resource Department which he recorded.  [Dkt. #106, Ex. 30].  Greenberg tells Ridgeway that "[w]hile I do understand that the service – the people to whom we outsource FMLA unfortunately have provided you with some information that is incorrect –which, I agree – I can understand why that is unfortunate, and we certainly wish that didn't happen.  Now, to confirm, the actual policy for FMLA in Connecticut is that it works on a rolling basis, not the 1st of the calendar year.  So in your particular

situation, your FMLA would have been completed or exhausted on December 31st.

So we were correct to send you a letter stating that, and again, the people that we

outsource to would have been incorrect to tell you that it was not

exhausted…normally what we would do is we would send you that letter, and you

would have 45 days where you would not get paid, where you would have an

opportunity to see if there was a job at RBS for you.  Once you were given your

return to work note from the doctor."  *Id.*   Ridgeway states that "I did everything I

was told by RBS, whether outsourced or not, and I was told that everything I was

doing was correct."   *Id.*   Greenberg responds that "I do understand that,

however, at the end of the day, there isn't a role for you.  Your role is not available

any more.  You did use the FMLA benefit …and had you not exhausted it, and if it

started on the calendar year, you would have – I guess in your mind you would've

had another four moths that you can be out from work.  And there's just simply

no way we're gonna have an employee out eight months in a row and we're

gonna hold their job open for them.  We're not in a position to be able to do that."

*Id.*

        The Parties dispute whether and when Ridgeway could have returned to

work after his surgery.  Ridgeway asserts that he could have returned to work as

early as February 2010.  [Dkt. #105, Pl. Local Rule 56(a)1 Statement, ¶98].  He

declared that "I would have informed my doctors that I was willing and able to

deal with the pain and that I was ready to return to work at any point in February,

March or April 2010."  [Dkt. #106, Ex. 14, Ridgeway Decl., ¶2].  Dr. Bendo declared

in an affidavit that "I would have not prevented Mr. Ridgeway from returning to

work at any point, if he reported that he was willing to work through the pain."
[Dkt. #106, Ex. 15. Bendo Aff., ¶11].  Another doctor, Grant Cooper, M.D., who
treated Ridgeway after his surgery declared in an affidavit that "[a]s far as I was
concerned, if cleared by his spine surgeon then Mr. Ridgeway was permitted to
return to work at any point at which he said that he could manage the plain.  I
would not have prevented Mr. Ridgeway from returning to work at any point in
January, February or March, if he represented that he was willing and able to deal
with his pain and of course with approval of his spine surgeon who would need to
give final medical clearance after a spine surgery."  [Dkt. #106, Ex. 33, Cooper
Aff., ¶¶6-7].[7]

 RBS contends that Ridgeway could not return to work until April 19, 2010
and that by April 19 he could only work on a part time basis due to his medical
condition.  [Dkt. #65, RBS Local Rule 56(a)1 Statement, ¶¶63-73].  RBS points to
Dr. Cooper's and Dr. Bendo's notes and testimony indicating that Ridgeway's
recuperation period was taking longer than planned, that Ridgeway could not sit
for more than 20 minutes, and that he couldn't concentrate because of his pain

---

[7] **RBS argues that these portions of Dr. Bendo's and Dr. Cooper's affidavits
contain inadmissible generalized and conclusory statements based on
impermissible assumptions. However as discussed above, Dr. Bendo and Dr.
Cooper's testimony is not generalized and conclusory but well within their
expertise as medical doctors.  Further it is well established that "as long as
expert's assumptions are not so unrealistic and contradictory as to suggest bad
faith," arguments that the "assumptions are unfounded go to the weight, not the
admissibility, of the testimony." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18,
21 (2d Cir. 1996) (internal quotation marks and citation omitted).  Courts have
"discretion under Federal Rule of Evidence 702 to determine whether the expert
acted reasonably in making assumptions of fact upon which he would base his
testimony." *Id.* (internal quotation marks and citation omitted).  To the extent
that RBS's objection to such testimony is based on the fact that Ridgeway is post hoc
asserting that he would have reported lessened pain levels that would go to the
weight and not the admissibility of such testimony.**

levels.  *Id.* at ¶¶64-66.  Dr. Bendo wrote that Ridgeway "has not achieved maximal medical improvement at this time…He will need six to eight hours per day to allow for physical therapy during the course of the day…He will return to work part time on Monday April 19…He continues to take Lyrica and Vicodin on a daily basis." *Id.* at ¶¶67.  Dr. Bendo also did not approve Ridgeway beginning physical therapy until April and his fist therapy session was on April 14, 2010. *Id.* at ¶69.

The Parties also dispute whether on April 19, 2010 when RBS contends Ridgeway's doctors authorized his return to work, there were other positions for which he was qualified available.  [Dkt. #65, RBS Local Rule 56(a)1 Statement, ¶74]; [Dkt. #118, Ridgeway Local Rule 56(a)2 Statement, ¶74].   RBS contends that it followed its FMLA policy by allowing Ridgeway 45 days after he was medically cleared to return to work to seek another open position.  [Dkt. #65, RBS Local Rule 56(a)1 Statement, ¶79].

On June 8, Greenberg sent Ridgeway an email asking him to choose between April 19 and June 4 as the date of his termination.  *Id.* at ¶82.  Ridgeway choose April 19, 2010 because he had begun collecting unemployment on that date.  *Id.* at ¶83.  On July 1, 2010, at Ridgeway's request, Hughes sent Ridgeway a termination letter stating that he had not been employed with RBS csicne April 19, 2010 and as of July 1, 2010 had no medical benefits through RBS.  *Id.* at ¶84. On October 15, 2010, Ridgeway filed a formal complaint with the CTDOL alleging that RBS interfered with his rights under the CT FMLA and retaliated against him for exercising those rights, which is still pending before the CT DOL.  *Id.* at ¶¶86-87.

### A.  Motion to Withdraw Admissions

RBS seeks to withdraw two judicial admissions it made in response to Ridgeway's requests to admit.  On the basis of one of Hewitt's Timelinea in addition to the recollection of HR professionals who spoke with Hewitt representatives, RBS made two admissions in response to Ridgeway's requests to admit that (1) "[i]n the conversation with Hewitt Associates on or about December 1, 2009, Hewitt granted Ridgeway's FMLA leave to begin on January 1, 2010" and (2) "[i]n December of 2009, Hewitt granted Ridgeway an FMLA leave to begin on January 1, 2010 and to run for twelve weeks."  *See* [Dkt. #64, Def. Mot. to Withdraw, p. 2-3].   RBS now argues that based on the audio tapes of the conversations between Ridgeway and Ebonie from Hewitt and on the basis of Ebonie's emails to Dawn Hughes in which she recounted her recollection of the December 1, 2009 recorded call to Hughes, it is clear that Ridgeway was only advised on CTFMLA and not FMLA refreshing in January during that call.

Under Rule 36(b):

A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended. Subject to Rule 16(e), the court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits.

Fed. R. Civ. P. 36(b).  "The prejudice contemplated by Rule 36(b) is not merely that the party obtaining the admission must, as a consequence of the withdrawal, prove the matter admitted but rather relates to difficulties the party may face in proving its case, such as the availability of key witnesses." *Security Ins. Co. of Hartford v. Trustmark Ins. Co.,* 217 F.R.D. 296, 298 (D.Conn. 2002).  "'Courts have

usually found that the prejudice contemplated by Rule 36(b) relates to special difficulties a party may face caused by a sudden need to obtain evidence upon withdrawal or amendment of an admission.'"  *Vandever v. Murphy*, No.3:09cv1752, 2012 WL 5507257, at *2 (D. Conn. Nov. 14, 2012) (quoting *Am. Auto. Ass'n (Inc.) v. AAA Legal Clinic of Jefferson Crooke, P.C.,* 930 F.2d 1117, 1120 (5th Cir.1991)).

In view of the fact that the recording of the December 1, 2009 call has been destroyed, Ridgeway would clearly suffer prejudice as a consequence of the withdrawal because he would now need to obtain evidence of the recording that was destroyed.  This is particularly prejudicial where RBS was aware of the need to preserve the recording as early as February 2010 when Ridgeway responded to Hughes's letter placing Hewitt on notice that there was a dispute regarding his FMLA entitlement and at the latest by April 2010 when Hughes learned that Ridgeway had been provided with incorrect information by Hewitt and when Hewitt emailed an account of the recorded call to RBS regarding Ridgeway's dispute.  Lastly, the need to preserve the recording had clearly arisen when on April 22, 2010, Greenberg, an RBS Human Resource representative, acknowledged that Hewitt provided Ridgeway with incorrect information and told him that it was "unfortunate" but that "we were correct to send you a letter stating [that leave was exhausted]… the people that we outsource to would have been incorrect to tell you that it was not exhausted." [Dkt. #106, Ex. 30].  Further, the Court is not persuaded that withdrawal would promote the presentation of the merits as there is evidence in the record that lends credence to truthfulness of

29

the admissions such as the May 20, 2009 and October 13, 2009 letters Hewitt sent on RBS letterhead, which expressly indicated that FMLA leave was calculated on a calendar year basis.  Further, the principal piece of evidence RBS relies on to support its position that withdrawal is warranted is Ebonie's email account of the December 1 call to Hughes which is arguably inadmissible and self-serving hearsay.

"Although an admission should ordinarily be binding on the party who made it, there must be room in rare cases for a different result, as when an admission no longer is true because of changed circumstances or through honest error a party has made an improvident admission." 8A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2264 (2d ed.1987).  Here, there is no indication that the admission is no longer true as a result of Ebonie's email which contained her third party account of the recorded call.   Moreover, because the recording has been destroyed there is no assurance that either party can point to which would definitely establish what was actually said during that call.   *Cf Sec. Ins. Co. of Hartford v. Trustmark Ins. Co.*, 217 F.R.D. 296, 298 (D. Conn. 2002) (granting motion to withdraw admission where later discovered evidence demonstrated that the admission was clearly erroneous).  Withdrawal is therefore not appropriate where RBS's allegedly later discovered evidence does not clearly demonstrate that the prior admission was erroneous.  As the presentation of the merits would not be promoted by permitting withdrawal and because Ridgeway would be prejudiced in defending this action on the merits, the Court finds it would be inappropriate to permit RBS to withdraw

these two admissions and accordingly denies RBS's motion to withdraw.

Further, had the admissions been allowed to be withdrawn, the Court would have

given the jury an adverse inference instruction, allowing the jury to infer that the

recordings contained evidence adverse to the Defendant's interests.

B. **Cross Motions for Summary Judgment**

**Legal Standard**

The standard for deciding the cross-motions for summary judgment is

familiar.  Summary judgment is appropriate only when "the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  No genuine disputes as to

any material fact exist, and summary judgment is therefore appropriate, when

"the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986).  A material fact is one which "might affect the outcome of the suit

under the governing law," and an issue is genuine when "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  But "[c]onclusory allegations will

not suffice to create a genuine issue."  *Delaware & Hudson Ry. Co. v.*

*Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990).

On cross-motions for summary judgment, the same standard applies.  *See*

*Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  "The court must

consider each motion independently of the other and, when evaluating each, the

court must consider the facts in the light most favorable to the non-moving

party." *Natural Res. Def. Council v. Evans*, 254 F. Supp. 2d 434, 438 (S.D.N.Y. 2003) (citing *Morales*, 249 F.3d at 121).

<u>Analysis</u>

I.      FMLA Interference Claims

Ridgeway asserts two factual predicates for his FMLA interference claim. First, Ridgeway argues that RBS interfered with his FMLA rights by providing him with misinformation regarding his entitlement to FMLA leave prior to his December 3, 2009 surgery and that he was prejudiced because he could have delayed his surgery until he would have been entitled to obtain additional FMLA leave.  Second, Ridgeway argues that RBS should be equitably estopped from arguing that Ridgeway was not entitled to FMLA leave starting in January and that RBS interfered with his FMLA rights by failing to reinstate him.  RBS argues that it only provided Ridgeway with incorrect information as to his entitlement to CT FMLA leave and not federal FMLA leave.  However as this Court has denied RBS's motion to withdraw those two judicial admissions, the admissions "conclusively establish[]" that on December 1, 2009,  Hewitt granted Ridgeway an FMLA leave to begin on January 1, 2010 and to run for twelve weeks. *See* Fed. R. Civ. P. 36(b).  It is further undisputed that Hewitt also provided Ridgeway with incorrect and misleading information regarding his entitlement to FMLA in the May 20, 2009 and October 13, 2008 letters Hewitt sent on RBS letterhead, which erroneously stated that FMLA leave was calculated on a calendar year basis rather than on a rolling basis.  As a result of these judicial admissions and of these two letters, the Court therefore finds there are no facts in dispute as to

whether RBS told Ridgeway in December 2009 that he was entitled to additional federal FMLA leave beginning in January 2010.   RBS argues that even if Ridgeway was provided with incorrect information regarding his entitlement to federal FMLA leave in December, he was not prejudiced as his surgery could not have been postponed  and also because he was employed for twelve weeks in 2010 and was unable to return to work at the end of those twelve weeks.

The FMLA entitles eligible employees to "twelve workweeks per year of unpaid leave, 'because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 174 (2d Cir. 2006) (quoting 29 U.S.C. §2612(a)(1)(D)).  Following such leave, the FMLA provides that the employee is entitled to be restored to a position equivalent to that previously held, including equivalent pay and benefits. 29 U.S.C. §2614(a)(1).  A regulation promulgated by the Secretary of Labor restricts an employee's right to return to an equivalent position following FMLA leave by providing that "[i]f the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA." 29 C.F.R. §825.216(c). The FMLA "creates a private right of action to seek both equitable relief and money damages against any employer . . . in any Federal or State court of competent jurisdiction should that employer interfere with, restrain, or deny the exercise of FMLA rights." *Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 724-25 (2003) (internal quotations and citations omitted).

"To establish an interference claim pursuant to 29 U.S.C. § 2615(a)(1), a plaintiff need only prove that an 'employer in some manner impeded the employee's exercise of his or her right[s]' protected provided by the FMLA.'" *Reilly v. Revlon, Inc.*, 620 F.Supp.2d 524, 535 (S.D.N.Y. 2009) (quoting *Sista,* 445 F.3d at 176).  While the FMLA does not define the term "interference," the United States Department of Labor has promulgated a regulation explaining that "'[i]nterfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. It would also include manipulation by a covered employee to avoid responsibilities under the FMLA." 29 C.F.R. §825.220(b). "Discouraging an employee from exercising rights protected by the FMLA can amount to a denial of benefits in violation of the FMLA upon a showing that the employer's purported acts of discouragement would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." *Tomici v. New York City Dept. of Educ.*, No.11-cv-2173, 2012 WL 6608510, at *13 (E.D.N.Y. Dec. 19, 2012) (internal quotation marks and citation omitted).

Although the Second Circuit has addressed in several instances claims of interference under the FMLA, it has not yet articulated or identified the standard to be applied to interference claims. *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004) (declining to articulate the standard governing interference claims where plaintiff's case involved retaliation rather than interference); *Sista*, 445 F.3d at 176 (declining to articulate the standard to be applied to inference

claims where plaintiff failed to present evidence sufficient to substantiate either claim).  The weight of authority in the Circuit, as reflected in the decisions of district judges in the Southern, Eastern, Northern and Western Districts of New York, holds that in order to establish a *prima facie* case of interference in violation of the FMLA a plaintiff must show that:

> (1) [H]e is an "eligible employee" under the FLMA; (2) that [the employer] is an employer as defined in [the] FLMA; (3) that [he] was entitled to leave under [the] FMLA; (4) that [he] gave notice to [the employer] of [his] intention to take leave; (5) that [he] was denied benefits to which she was entitled under [the] FMLA. *See Higgins v. NYP Holdings, Inc.*, 2011 WL 6082702, at *9 (S.D.N.Y. Dec. 7, 2011); *Baker v. AVI Foodsystems, Inc.*, No. 10-CV-00159 (A)(m), 2011 WL 6740544, at *13 (W.D.N.Y. Dec. 6, 2011); *Debell v. Maimonides Med. Ctr.*, No. 09-CV-3491 (SLT)(RER), 2011 WL 4710818 (E.D.N.Y. Sept. 30, 2011);  *Leclair v. Berkshire Union Free Sch. Dist.*, No. 1:08-CV-01354 (LEK/RFT), 2010 WL 4366897, at *5 (N.D.N.Y. Oct. 28, 2010).

Further, in *Potenza*, the Second Circuit acknowledged that claims of interference and retaliation raise distinct causes of action under the FMLA. 365 F.3d at 167-68.  The Second circuit explained that the *McDonnell Douglas* burden-shifting analysis from the Title VII only applies to FMLA retaliation claims because the employer's intent in such a claim is material.  *Id.*  at 168.  Conversely, the *McDonnell Douglas* analysis is not appropriately applied to interference claims where intent is not material because "the question is simply whether the employer in some manner impeded the employee's exercise of his or her right." *Id.*

a.  Interference with scheduling leave under the FMLA

Ridgeway contends that RBS's incorrect information as to his FMLA entitlement prevented him from structuring his leave to ensure it was covered

under the FMLA.  As this Court explained in its prior decision on RBS's motion to dismiss, the Second Circuit has recognized the potential for an interference cause of action premised upon "an employer's failure to post a notice where that failure leads to some injury." *Kosakow v. New Rochelle Radiology Assoc.*, 274 F.3d 706, 723-24 (2d Cir. 2001).  Further, this Court explained in its decision on the motion to dismiss that misleading or incorrect information regarding an employee's entitlement to FMLA leave can also interfere with an employee's attempt to exercise his or her rights under the FMLA if the employee was prejudiced by the misleading or incorrect information.  *See Kanios v. UST, Inc.*, No. 3:03cv369 (DJS), 2005 WL 3579161, at *10-11 (D.Conn. Dec. 30, 2005) (denying a motion for summary judgment on an interference claim on the basis that plaintiff "may be able to prove that [the defendant] interfered with her FMLA rights by intentionally overstating the amount of leave available to her," thereby misinforming her of when she needed to return to work in order to secure the benefit of the right to reinstatement); *see also Edwards v. Dialysis Clinic, Inc.*, 423 F.Supp.2d 789, 795–796 (S.D.Ohio 2006) ("An employer can be held liable for interference with FMLA entitlements if it incorrectly advises an employee regarding her leave rights" and if the error prejudiced the employee.); *Schober v. SMC Pneumatics, Inc.*, No. IP 99-1285-CT/G, 2000 WL 1911684, at *5 (S.D.Ind. Dec. 4, 2000) ("misleading or giving incorrect information to an employee by an employer about the employee's FMLA rights or obligations constitutes interference if the incorrect information causes the employee to forfeit FMLA protection"); *Mora v. Chem Tronics, Inc.*, 16 F.Supp.2d 1192, 1228-29

(S.D.Cal.1998) ("This Court holds that a Plaintiff can be discouraged from taking absences whether or not s/he knows that such absences could be covered by the FMLA as opposed to other arrangements an employer might make. The bottom line is a Plaintiff is discouraged from doing something that he or she would like to do, but does not do because of a lack of or misinformation."); *Spagnoli v. Brown & Brown Metro, Inc.*, No.06-414(FLW), 2007 WL 2362602, at 12-13* (D.N.J. Aug. 15, 2007) (holding there were triable issues of fact on an FMLA interference claim "as to whether Plaintiff was given reason to believe that her absence was deemed covered under FMLA" where plaintiff was never given notice that she had exceeded allowable FMLA leave and employer ensured her that her absence would "have no impact on her job").

Several facts support the conclusion that Ridgeway was given misinformation concerning his medical leave benefits. RBS's judicial admissions establish that Ridgeway was orally misinformed on December 1, 2009 regarding his FMLA entitlement.  Further, Ridgeway was misinformed by the May 20, 2009 and October 13, 2009 letters Hewitt sent on RBS letterhead, which erroneously stated that FMLA leave was calculated on a calendar year basis rather than on a rolling basis.  These errors were tacitly acknowledged by Hewitt and RBS.  There are therefore no disputed issues of fact as to whether Ridgeway was provided with incorrect information regarding his federal FMLA entitlement in December 2009.8  RBS argues that even if Ridgeway was provided with incorrect

_____

8 RBS also contends that Ridgeway's belief that his FMLA leave was calculated on a calendar year basis was unreasonable because its FMLA policy unambiguously stated that FMLA leave was calculated on a rolling back basis and that he failed to follow step one for applying for FMLA leave which directs

37

information regarding his federal FMLA leave which this Court has deemed undisputed in light of the judicial admissions and on the basis of the May and October 2009 letters, his claim for interference necessarily fails because he suffered no prejudice as a result of the incorrect information.  RBS argues there is no prejudice because Ridgeway's surgery was medically necessary and could not be postponed.  However the evidence in the record demonstrates that there is a material dispute of fact as to whether the surgery was necessary and could be postponed.  Ridgeway's own surgeon declared that in his professional opinion, the surgery was not medically necessary and could have been postponed and Ridgeway testified that he would have delayed the surgery if he had been correctly informed he would have no job protected medical leave if he underwent the surgery.   Other courts have found prejudice and FMLA inference where an employer impedes an employee's ability to structure FMLA leave in such a way that would have enabled an employee to receive FMLA protection.  *Conoshenti v. Public Service Electric & Gas Co.,* 364 F.3d 135, 1443 (3d Cir.2004) (holding that FLMA interference can be found where employer fails to give proper information that would allow an employee to structure leave in a way that would have left employee protected by the FMLA);  *Downey v. Strain,* 510 F.3d 534, 541 (5th

---

employees to review the policy.  However in view of the fact that the policy expressly warns employees that it is merely "guidance," should "not be relied upon," and is "subject is to change at any time at the sole discretion of RBS," it would not be unreasonable for Ridgeway to believe that Hewitt's determination of his FMLA eligibility was operative despite the policy's language suggesting the contrary.  [Dkt. #105, Pl. Local Rule 56(a)1 Statement, ¶31].   The reasonableness of Ridgeway's belief is further underscored by the May 20, 2009 and October 13, 2009 letters Hewitt sent on RBS letterhead, which indicated that FMLA leave was calculated on a calendar year basis.

Cir.2007) ("Downey proved that she was actually prejudiced by her employer's noncompliance with the [notice] regulations: had she received individualized notice, she would have been able to postpone her surgery to another FMLA period").  As this Court previously held, Ridgeway's theory that incorrect or misleading information regarding FMLA leave entitlement which prevents an employee from structuring his leave in a way to ensure he is protected under the FMLA is a viable one as the incorrect information "impede[s] the employee's exercise of his or her right[s]' protected provided by the FMLA.'" *Reilly*, 620 F.Supp.2d at 535 (quoting *Sista,* 445 F.3d at 176).  Ridgeway can therefore demonstrate prejudice by showing he could have delayed his surgery until he was entitled to additional FMLA leave and that it would not have been necessary for him to take any FMLA leave during that period as a result of his medical condition.  See *Downey v. Strain*, No.Civ.A.04-2593-SS, 2005 WL 3541052, at *7 (E.D.La. Dec. 7, 2005).  Consequently, there are triable issues of fact as to whether Ridgeway was prejudiced by the incorrect and misleading information he received, which precludes summary judgment in favor of either party on Ridgeway's FMLA interference claim.

In the alternative, RBS argues that Ridgeway's FMLA interference claim also fails because Ridgeway was employed by RBS for an additional 12 weeks in 2010 and was not able to return to work at the expiration of those 12 weeks in March.  RBS argues that Ridgeway did, in effect, receive all the FMLA leave he would have been entitled to if RBS had calculated FMLA on a calendar year basis and because he could not return at the end of those weeks he did not suffer any

prejudice.  This argument is misplaced for several reasons.  First, it was happenstance that Ridgeway remained employed with RBS for more than 12 weeks after he had exhausted his FMLA entitlement in December under RBS's policy of calculating FMLA leave on a rolling back basis.  In the letter dated January 25, 2010 from Dawn Hughes, Hughes explains that Ridgeway's position was no longer available because he exhausted his FMLA leave but he remained employed as long as his disability claim was approved.  *See* [Dkt. #106, Ex. 24]. Therefore if Ridgeway's Short Term Disability ("STD") benefits had been terminated prior to March 2010, Ridgeway would not have been employed with RBS for a 12 week period in 2010.  It is therefore disingenuous for RBS to argue that Ridgeway actually received FMLA leave because he remained on the payroll in excess of 12 weeks in connection with his entitlement to an entirely different type of benefit.

Second, Ridgeway did not actually receive the benefit of an additional 12 week FMLA leave in 2010 as RBS contends because in January his job had been put into the posting process and was no longer available.   If Ridgeway had actually received an additional twelve weeks of FMLA leave in 2010, RBS would have not placed his position in the posting process in January or RBS would have been required to provide him with an equivalent position once he returned from leave.  The Court therefore finds that the fact that Ridgeway was employed by RBS in excess of 12 weeks in 2010 as a result of his disability claim is irrelevant to this FMLA interference claim, which is predicated on interference

with Ridgeway's ability to schedule FMLA leave.  Accordingly, the Court denies the Parties' cross motions for summary judgment on this interference claim.

    **b.  Interference based on failure to reinstate**

    Ridgeway argues that RBS should be equitably estopped from denying that he was eligible for an additional twelve weeks of leave starting in January 2010 and therefore interfered with his FMLA rights when it refused to reinstate him to an equivalent position after the expiration of the leave.  The Second Circuit has recognized in the context of FMLA claims that "the doctrine of equitable estoppel itself may apply where an employer who has initially provided notice of eligibility for leave later seeks to challenge that eligibility. Thus, future employees who rely to their detriment upon the assurance of their employer that they qualify for leave under the FMLA may have recourse to the doctrine of equitable estoppel." *Woodford v. Community Action of Greene County, Inc.*, 268 F.3d 51, 57 (2d Cir. 2001).  In view of the judicial admissions and the May and October 2009 letters which establish that RBS provided notice to Ridgeway that he was FMLA eligible beginning in January 2010, Ridgeway may have recourse to the doctrine of equitable estoppel if he relied on that assurance to his detriment.   RBS contends there could be no detrimental reliance because Ridgeway could not have postponed his surgery.  However as discussed above, the Court has found there are triable issues of fact as to whether his surgery could have been delayed.   If Ridgeway is able to establish that he relied to his detriment on Hewitt's representation that he has eligible for FMLA leave again in January 2010, RBS would be estopped from denying that eligibility.

If RBS is estopped, there could only be interference based on RBS's refusal to reinstate Ridgeway to an equivalent position when his FMLA leave expired in March 2010.  *See Geromanos v. Columbia Univ.,* 322 F.Supp.2d 420, 428 (S.D.N.Y.2004) ("Because plaintiff received the full twelve weeks of leave as allowed by the act, the only other right with which Columbia could be found to have interfered is the right to reinstatement at the end of her leave.").   The Second Circuit made clear in *Sarno* that an employee's right to reinstatement would not be impeded where he was unable to return to work after twelve weeks of leave. *Sarno* 183 F.3d at 161-62 ("Any lack of notice of the statutory 12-week limitation on FMLA leave could not rationally be found to have impeded Sarno's return to work" where it was undisputed that that sarno could not return to work two months after the end of 12 week FMLA period).  *Sarno* instructs that if Ridgeway was unable to return to work after 12 weeks of leave in 2010 his right to reinstatement based on the incorrect information Hewitt provided in December would not have impeded his return to work.   RBS argues that Ridgeway was unable to return to work in March when his 12 weeks of FLMA would have expired.  However, Ridgeway has provided some evidence when viewed in the light most favorable to him creates a genuine dispute of fact as to whether he would have been able to return to work at the end the 12 week leave in March.  Consequently, there are triable issues of fact as to whether RBS should be equitably estopped from challenging that Ridgeway was entitled to FMLA leave beginning in January.  There are also triable issues of fact, even if RBS is equitably estopped, as to whether Ridgeway was able to return work in order to

establish his FMLA interference claim.   The Court therefore also denies the Parties' cross motions for summary judgment on this FMLA interference claim.

     II.      FMLA Retaliation

     Ridgeway argues that RBS terminated his employment in April 2010 in retaliation for exercising his rights under the FMLA.  FMLA Retaliation claims are analyzed under the *McDonnell Douglas Corp. v. Green*, 511 U.S. 792 (1973) burden-shifting framework.  To establish a prima facie claim for retaliation a Plaintiff must "(1) she exercised rights protected under the FMLA; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Reilly.,* 620 F.Supp.2d at 537–38 (citing *Potenza*, 365 F.3d 165).  "If the plaintiff establishes a *prima facie* case, there is a presumption of retaliation, and the burden shifts to the defendant to provide a legitimate nondiscriminatory reason for the termination.  If the defendant makes such a showing, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered legitimate reason for her termination was pretextual." *Nagel v. County of Orange*, No.09-cv-9960(CS), 2013 WL 1285465, at *9 (S.D.N.Y. Mar. 28, 2013) (citation omitted). "To defeat summary judgment, plaintiff need not show that defendant's proffered reason was false or played no role in the decision to terminate him, but only that it was not the only reason, and that h[is] filing for FMLA leave was at least one motivating factor."  *Id.* (internal quotation marks and citation omitted).

First, RBS argues that because Ridgeway's retaliation claim is predicated on a failure to reinstate such a claim is properly pled as an interference claim and therefore his retaliation claim should be dismissed as a matter of law.  Ridgeway argues that such a characterization is a mistake as Ridgeway was terminated after his leave had ended in March and therefore his claim is not predicated on RBS's failure to reinstate Ridgeway after his leave expired.

Second, RBS argues that even if Ridgeway has properly pled a retaliation claim summary judgment should be granted in its favor because Ridgeway's employment was terminated more than three weeks after his "claimed FMLA leave" expired in March and more than four and ½ months after his actual FMLA expired in December when his doctor authorized a limited return to work. Assuming that Ridgeway has made out a prima facie case, RBS argues Ridgeway was terminated for the legitimate reason that when his leave expired he was unable to return to work. Courts have held that "[t]erminating an employee for failure to return from a leave of absence is a legitimate, non-discriminatory reason for termination." *Douglas v. Long Island Jewish Med. Ctr.,* No. 08–CV–1370, 2010 WL 3187929, at *7 (E.D.N.Y. July 29, 2010).  RBS asserts there is no evidence that it was motivated by discriminatory intent when it terminated Ridgeway's employment.

Ridgway argues there are disputed facts as to RBS's reasons for terminating him, which preclude summary judgment.  Ridgeway argues that a reasonable juror could conclude that RBS's proffered reason was pretextual because (i) Ridgeway had the ability to return to work, (ii) RBS failed to look for a

suitable available position for Ridgeway when they gave him 45 days to find other employment within RBS in April, and (iii) because his termination occurred within days of Ridgeway contacting the CTDOL regarding his rights.

However, Ridgeway cannot demonstrate pretext by asserting that he could have returned to work earlier because there is no evidence that RBS was aware that Ridgeway would have told his doctors that he could work through the pain and would thus obtain medical clearance to fully return to work when they terminated his employment.   It is undisputed that on April 7, Dr. Cooper completed an FMLA Health Care Provider Certification which certified that Ridgeway could not return to work until April 19, and only then on a part time basis.  [Dkt. #65, RBS Local Rule 56(a)1 Statement, ¶71].  Based on the medical information that RBS had been provided by Ridgeway's doctors, it was not unreasonable for RBS to determine that Ridgeway was unable to return to work. Without evidence that RBS had knowledge that Ridgeway was willing to return and work through his pain, Ridgeway cannot establish pretext on the basis of his assertion that RBS wrongly concluded he was unable to return to work.

Further, Ridgeway's argument that pretext can be demonstrated by the close temporal proximity between his termination and when he contacted the CTDOL is misplaced.  The decision to terminate Ridgeway in effect occurred in January when RBS informed him that it was posting his position as he had exhausted his available medical leave.  As explained above, Ridgeway only remained an employee because his short term disability claim had been approved.  Ridgeway contacted the CTDOL months after RBS had posted his

position and effectively made the decision to terminate his employment. Therefore no reasonable trier of fact could conclude that RBS's decision to terminate him was influenced by Ridgeway contacting the CTDOL.   In addition, although RBS did not actively seek a position for Ridgeway in April, they did provide him with access to internet sites listing job openings at RBS that enabled Ridgeway to apply for positions within the 45 day period.  No reasonable juror could conclude that RBS was motivated by retaliation because it did not actively look through the job listings for Ridgeway when it allowed him access to those listings and the ability to apply to any positions on those listings.

Lastly, the fact that Hewitt provided Ridgeway with incorrect information as to his medical leave entitlement cannot establish that RBS was motivated by retaliatory animus.  It is undisputed that the RBS employee who made the decision to post Ridgeway's position in January was unaware that Ridgeway had been provided with erroneous information by Hewitt at that time.  Moreover, the parties do not dispute that RBS's policy had always calculated FMLA leave on a rolling back basis and had never changed during this time period and therefore Hewitt simply erred when it informed Ridgeway that he was entitled to additional FMLA leave starting in January 2010.  In view of the facts that RBS's FMLA policy for employees within Ridgeway's classification never changed and that RBS became aware of Hewitt's error after Ridgeway's position had been posted, no reasonable trier of fact could find that RBS's reasons for termination were pretextual.  As intent is material to a FMLA retaliation claim, Ridgeway cannot maintain this claim in the absence of evidence demonstrating that RBS was

motivated by discriminatory intent.  The Court accordingly grants summary

judgment in favor of RBS on Ridgeway's FMLA retaliation claim.

III.    Promissory Estoppel and Negligent Misrepresentation Claims

RBS reasserts several arguments in its motion for summary judgment that

it previously made in its motion to dismiss regarding Ridgeway's promissory

estoppel and negligent misrepresentation claims, which were addressed and

ruled upon by this Court.  RBS reasserts its argument that Ridgeway's

promissory estoppel and negligent misrepresentation claims are precluded by

statutory preemption principles.  For the same reasons as the Court articulated in

the decision on the motion to dismiss, the Court finds that Ridgeway's

promissory estoppel and negligent misrepresentation claims are not precluded

by the doctrine of statutory preemption. *See* [Dkt. #40, MTD Decision, p. 32-40].

The Court also stresses that Ridgeway's promissory estoppel and negligent

misrepresentation claims are not redundant or duplicative of his CTFMLA claim

or a claim under Conn. Gen. Stat. §31-71f.9  Although these claims are based on

---

9 **RBS argues that Conn. Gen. Stat. §31-71f preempts Ridgeway's negligent misrepresentation claim.  Section 31-71f requires that each employer "(1) [a]dvise his employees in writing, at the time of hiring, of the rate of remuneration, hours of employment and wage payment schedules, and (2) make available to his employees, either in writing or through a posted notice maintained in a place accessible to his employees, any employment practices and policies or change therein with regard to wages, vacation pay, sick leave, health and welfare benefits and comparable matters."  Conn. Gen. Stat. §31-71f.  However, Ridgeway's negligent misrepresentation claim is not predicated on RBS's failure to make available to Ridgeway its policies with regard to health and welfare benefits, but rather on Hewitt's misstatements that Ridgeway was entitled to take leave under the federal FMLA and the CT FMLA starting in January 2010.  The Court therefore does not see why relief under Conn. Gen. Stat. §31-71f would preclude Ridgeway's negligent misrepresentation claim, which is based on conduct that clearly falls outside the scope of §31-71f.**

the same nucleus of facts, the promissory estoppel and negligent misrepresentation claims address different types of harms than the harms sought to be prevented and remedied under the CTFMLA or a claim under Conn. Gen. Stat. §31-71f.   The harm sought to be remedied for negligent misrepresentation and promissory estoppel are respectively the reliance on a negligently made false representation and the failure to abide by a promise which was relied upon.   A CTFMLA interference claim seeks to remedy the harm of an employer interfering with an employee's ability to exercise his or her rights under the CTFMLA and Conn. Gen. Stat. §31-71f seeks to ensure that employers post their medical leave policies to employees.  Statutory preemption is not warranted any time a common nucleus of facts gives rise to liability under both tort and statutory regimes.

RBS also reasserts its argument that negligence claims are not viable in the employment context which it made on the motion to dismiss.  For the same reasons as the Court articulated in the decision on the motion to dismiss, the Court finds that Ridgeway's claim of negligent misrepresentation is not barred as a matter of law.  [Dkt. #40, p. 38-40].

Ridgeway argues that RBS is liable for promissory estoppel and negligent misrepresentation because he relied on the false representations that he was entitled to additional medical leave starting in January and had job protection through April to his detriment.  To establish a *prima facie* case of promissory estoppel a plaintiff must establish the following elements: "(1) a promise (2) which the promisor should reasonably expect to induce action or forbearance (3) on the part of the promisee or a third person and (4) which does induce such

action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Ferrucci v. Town of Middlebury*, 131 Conn. App. 289, 305 (2011) (citing RESTATEMENT (SECOND) OF CONTRACTS § 90 (1) (1981)).  A claim of negligent misrepresentation is established when (1) the defendant made a misrepresentation, (2) the defendant knew or should have known that the representation was false at the time, and (3) the plaintiff reasonably relied upon the representation to the plaintiff's detriment.  *Kanios*, 2005 WL 3579161 at *11.

RBS argues that summary judgment should be granted on both Ridgeway's negligent misrepresentation and promissory estoppel because Ridgeway's reliance on any "alleged misrepresentations concerning job-protection was not reasonable, as a matter of law, because he was employed at-ill and because GBM's policies informed him that leave was calculated using the 'rolling back' method." [Dkt. #65, Def. Mem., p. 34].  Whether RBS's reliance on Hewitt's representations was reasonable is a fact for the jury to determine.  As noted above, the Court does not find such reliance unreasonable as a matter of law on the basis of RBS's policy because the policy expressly warns employees that it is merely "guidance," should "not be relied upon," and is "subject is subject to change at any time at the sole discretion of RBS."

Further, Ridgeway's at will employment status does not preclude him from demonstrating that he reasonably relied on Hewitt's representations in order to establish a claim for promissory estoppel or negligent misrepresentation.  As Ridgeway points out, the Connecticut Supreme Court recently affirmed a jury finding for an at-will employee on her claims for both promissory estoppel and

negligent misrepresentation.   *Stewart v. Cendant Mobility Servs. Corp.*, 267 Conn. 96 (2003).  Indeed, the argument that reliance on an employer's promise "was unreasonable due to the fact that the plaintiff, herself, conceded that she was an at-will employee, and consequently, could be terminated at any time" was rejected in *Stewart* where the employer made a sufficiently clear and definite promise not to adversely affect employment for a specific reason.  *Id.* at 115 n.10. The Connecticut Supreme Court explained that this argument lacked merit because "[a]lthough the plaintiff acknowledged her status as an at-will employee, she also testified repeatedly, clearly and unwaveringly that, on the basis of Simon's representations, she believed that Cendant could not and would not terminate her if her husband subsequently secured employment with a competitor. Thus, the evidence supported the conclusion that Cendant could have terminated the plaintiff for any reason *except* her husband's employment with a competing firm."  *Id.*  When viewing the evidence in the light most favorable to Ridgeway, a reasonable juror could conclude that on the basis of Hewitt's representations that RBS could have terminated him for any reason except for his absence as a result of taking medical leave through April.   The holding in *Stewart* instructs that Ridgeway may establish a claim promissory estoppel and/or negligent misrepresentation even though he was employed at-will if the trier of fact concludes that Hewitt's representations amounted to a sufficiently clear and definite promise not to terminate Ridgeway's employment for his absence until April as a result of taking additional medical leave.  *See also Gombossy v. Hartford Courant, Co.*, No.X07CV095033169S, 2010 WL 5158248, at

*3 (Conn. Super. Ct. Nov. 29, 2010) ("As to the defendants' argument that the plaintiff's at-will status defeats a promissory estoppel claim, the *Stewart* court impliedly rejected this same argument" and holding that plaintiff had sufficiently stated a claim for negligent misrepresentation), *Goldstein v. Unilever*, No.397881, 2004 WL 1098789, at *4-5 (Conn. Super. Ct. May 3, 2004) (holding that "the doctrine of promissory estoppel is not inapplicable solely because the plaintiff's contract was for employment at will.").

Further, the cases that RBS relies on in support of this proposition are inapposite as they involved representations that did not amount to a sufficiently clear and definite promise not to adversely affect employment for a specific reason as was the case in *Stewart*. *See Desrosiers v. Diageo North America, Inc.*, 137 Conn. App. 446, 459-60 (2012) (holding that employee did not reasonable rely on employer's representation that she was performing satisfactorily where employer reserved the "unfettered discretion to end the employment relationship at any time") (internal quotation marks and citation omitted); *Petitte v. DSL.net, Inc.*, 102 Conn.App. 363, 373 (2007) (holding that employment offer did not constitute negligent misrepresentation because "it (1) did not guarantee employment and (2) stated that any employment relationship was at will."); *Lowe v. AmeiGas*, Inc., 52 F.Supp.2d 349, 361 (D. Conn. 1999) (holding there was no reasonable reliance on employer's statements that "he would be terminated for fair reasons" where employment was at-will); *Grossman v. Computer Curriculum Corp.*, 131 F.Supp.2d 299, 305, 308-09 (D. Conn. 2000) (holding that oral reassurances of continued job security were neither sufficiently promissory nor

sufficiently definite to support contractual liability when viewed in conjunction with the defendant's various disclaimers concerning the plaintiff's at-will employment status to establish promissory estoppel or negligent misrepresentation) (citation omitted).  In viewing the facts in the light most favorable to Ridgeway, he has asserted that RBS made representations that he would have job protected leave through April that are "sufficiently promissory" and "sufficiently definite" to support liability under both promissory estoppel and negligent misrepresentation.  The Court therefore finds that Ridgeway's reliance on Hewitt's representations that he was eligible for job protected medical leave through April was not unreasonable as a matter of law in light of his at-will employment status.

RBS argues in the alternative that Ridgeway's promissory estoppel and negligent misrepresentation claims also fail because he did not incur any injury as a result of his reliance because he was unable to return to work in March and April after his "claimed" FMLA and CT FMLA leave ended.   As discussed above, there are triable issues of fact as to whether Ridgeway was able to return to work in March and April that preclude summary judgment on this basis.

RBS also argues that Ridgeway's promissory estoppel claim fails because he did not change his position on the alleged misrepresentation as he simply went ahead with his planned surgery on December 3, 2009.  "To succeed on a claim of promissory estoppel, the party seeking to invoke the doctrine must have relied on the other party's promise.  That reliance, of course, may take the form of action or forbearance." *Stewart*, 257 Conn. at 113.  In other words, the promisee

"must actually change his position or do something to his injury which he otherwise would not have done."  *W. v. W.,* 256 Conn. 657, 661, 779 (2001) (citations omitted).  RBS's argument relies on misconstrued semantics. Ridgeway has testified that had he been informed that he was not eligible for additional job protected medical leave on December 1, he would have cancelled his December 3 surgery.  Therefore, Ridgeway has provided evidence that he did something to his injury when he decided to go ahead and not cancel the scheduled surgery on the basis of the representation that he was entitled to job protected medical leave until April.  Because reliance may take the form of forbearance or action, Ridgeway has provided evidence when viewed in the light most favorable to him that he detrimentally relied on the representations that he was eligible for job protected medical leave until April by not cancelling the planned surgery.

RBS further argues that Ridgeway's negligent misrepresentation claim fails because "whatever duty GBM may have with regard to communicating information concerning benefits arises from statute, not a general duty" and points to the CTFMLA and Conn. Gen. Stat. §31-71f as the sources of such duty. [Dkt. #65, RBS Mem., p. 38].  As Ridgeway points out, RBS cites no caselaw in support of this argument nor is the Court aware of any support for this proposition.  Indeed, there is precedent to the contrary.  The Connecticut Supreme Court has explained that "[t]he existence of a duty of care is an essential element of negligence.... A duty to use care may arise from a contract, *from a statute*, or from circumstances under which a reasonable person, knowing

53

what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." *Pelletier v. Sordoni/Skanska Const. Co.*, 286 Conn. 563, 578 (2008) (internal quotation marks and citation omitted) (emphasis added).  Further, the doctrine of negligence per se is premised on the concept that a duty of care may be derived from statute. *See Considine v. Waterbury,* 279 Conn. 830, 860-61 n. 16 (2006) ("Negligence per se operates to engraft a particular legislative standard onto the general standard of care imposed by traditional tort law principles, i.e., that standard of care to which an ordinarily prudent person would conform his conduct.  To establish negligence, the jury in a negligence per se case need not decide whether the defendant acted as an ordinarily prudent person would have acted under the circumstances. [It] merely decide[s] whether the relevant statute or regulation has been violated. If it has, the defendant was negligent as a matter of law.") (internal quotation marks and citation omitted).  Even if RBS's duty of care is derived from statute, that would not defeat a claim sounding in negligence because a duty of care in negligence may arise from statutory sources.  To the extent that RBS is really recasting its prior argument that the CTFMLA and Conn. Gen. Stat. §31-71f preempt a cause of action for negligent misrepresentation, this Court has already rejected those arguments.

Lastly, Ridgeway argues that he is entitled to summary judgment in his favor on both his negligent misrepresentation and his promissory estoppel claims because RBS admits he received incorrect information regarding both his CT FMLA and FMLA entitlement in December.  However, as discussed above,

there are triable issues as to whether Ridgeway reasonably relied on Hewitt's representations in light of the FMLA policy posted on the intranet and his at will employment status.  There are also triable issues of fact as to whether Ridgeway relied on those representations to his detriment in view of that disputes facts of whether Ridgeway could have delayed his surgery or returned to work in March or April which preclude a finding of summary judgment in favor of Ridgeway on both his promissory estoppel and negligent misrepresentation claims.

RBS makes several arguments regarding the availability of damages on a claim for promissory estoppel and negligent misrepresentation.  First, RBS argues that Ridgeway is not entitled to "benefit of the bargain" damages he seeks under either his promissory estoppel or his negligent misrepresentation claims.  RBS further argues that lost wages are not a proper measure of damages to the extent they represent damages based on the failure to receive the benefit of the bargain.  First, RBS relies on cases from other states and jurisdictions in support of its damages arguments which do not interpret Connecticut law and are therefore unpersuasive.  RBS only cites to two cases interpreting Connecticut law in support of these arguments.   However, these cases do not instruct that economic losses such as lost wages are unavailable on a promissory estoppel or negligent misrepresentation claim.  RBS relies on *Eremita v. Stein*, No.CV94-0463110S, 1995 WL 670061, at *6 (Conn. Super. Ct. Nov. 2, 1995) in which the court held that a "remedy for negligent misrepresentation is considered to be independent of a remedy on a contract." However, the *Eremita* court did not hold that economic damages such as lost wages were unavailable on a negligent

misrepresentation claim.  Instead, the court explained that a "defendant who is not liable for representations based on promissory estoppel can, nonetheless, be liable in tort for negligent misrepresentation" and therefore a "a claim of negligent misrepresentation, based on statements made during the course of a contractual relationship, may be brought even though purely economic losses are alleged." *Id.*

Second, RBS relies on *Pavliscak v. Bridgeport Hospital*, No.CV91200174S, 1996 Conn. Super. LEXIS 1945 (Conn. Super. Ct. July 25, 1996) in which the court held that the "proper measure of damages on the Plaintiff's theory of promissory estoppel is the loss incurred by the plaintiff in reasonable reliance on the promise."  *Id.* at 1.  In *Pavliscak*, the court found the jury erred in awarding front pay for three years and pension benefits for eleven years in view of the fact that the evidence introduced at trial established that the plaintiff was employed at will. The Court concluded that the award of front pay and pension benefits was in error because it was based on a "on a hypothetical bargain which was not supported by the evidence." *Id.* at 3.  However, the *Pavliscak*'s court analysis does not foreclose an award of front pay or benefits on a promissory estoppel claim but rather instructs that any award for front pay or benefits may not be based on speculation and unsupported by evidence.  Therefore, if Ridgeway is able to introduce evidence as to his entitlement to front pay and benefits that would not be speculative in light of his at will employment status, Ridgeway may be entitled to such damages.

The conclusion that back pay, front pay and benefits may be available on a promissory estoppel and negligent misrepresentation claim is further bolstered by the Second Circuit's conclusion that post-termination economic damages are available on a promissory estoppel claim in Connecticut.  The Second Circuit recently addressed "the question of whether a wrongfully-terminated at will employee is entitled to post-termination economic damages."  *Holt v. Home Depot USA, Inc.*, 135 F. App'x 449, 450 (2d Cir. 2005).  In considering this question, the Second Circuit reasoned from the Connecticut Supreme Court decisions in T*orosyan v. Boehringer Ingelheim Pharms., Inc.,* 234 Conn. 1, 16 (1995) and *Stewart,* 267 Conn. 96, to hold that "Connecticut does allow a judgment …that awarded future wages to an at will employee up through the date of judgment on a promissory estoppel claim." *Holt v. Home Depot USA, Inc.*, 135 F. App'x 449, 450 (2d Cir. 2005).   In *Torosyan*, the Connecticut Supreme Court allowed "damages [that] extend for a reasonable time period into the future, at least for a future period of time equal to the period from the time of the wrongful termination until the date of judgment." 234 Conn. at 34.  In *Stewart*, the Connecticut Supreme Court approved an award of future lost wages on a promissory estoppel and negligent misrepresentation claim by an at will employee.  267 Conn. at 98-99.  Although the Second Circuit's holding in *Holt* was predicated with respect to just a promissory estoppel claim, the Court sees no reason why the Second Circuit's logic would also not apply to Ridgeway's negligent misrepresentation claim as the *Stewart* court permitted the same award for both a promissory estoppel and a negligent misrepresentation claim.

Therefore, reading *Stewart* and *Torosyan* together suggests that Connecticut law allows a judgment awarding future wages to an at will employee up through the date of judgment on both a promissory estoppel and negligent misrepresentation claim.  Consequently, Ridgeway will be permitted to seek post-termination economic damages such as future wages from time of the wrongful termination until the date of judgment.

RBS also argues that emotional distress damages are not "out of pocket" reliance damages and are not available on a negligent misrepresentation claim. In support of this argument, RBS relies on a Fifth Circuit case which interprets Texas law and is therefore irrelevant and unpersuasive.  RBS points to no cases interpreting Connecticut law which supports this contention.  In Connecticut, there does not appear to be any appellate court cases that have addressed whether damages for emotional distress are recoverable on a claim for negligent misrepresentation.  S*ee Craine v. Trinity College*, No.CV950555013S, 1999 WL 1315017 at *10 (Conn. Super. Ct. Dec. 27, 1999).  Although as some courts have noted that "[t]he Restatement Second of Torts ... suggests that the damages available for negligent misrepresentation are pecuniary losses," there are several Connecticut superior court cases, which have awarded noneconomic damages on a negligent misrepresentation claim. *Craine,* 1999 WL 1315017 at *10; *Schlierf v. Abercrombie & Kent, Inc.*, No.CV05503467(X02), 2012 WL 3089387, at *3 (Conn. Super. Ct. July 2, 2012) ("Several superior court decisions have permitted noneconomic damages for physical or emotional harm stemming from negligent misrepresentations") (citing cases).  These cases have reasoned that § 552 of the

Restatement Second of Torts (1979) is not guiding because the principles set forth "relate to commercial transaction s and are concerned only with liability for pecuniary loss resulting from misrepresentations or nondisclosures."  *Schlierf*, 2012 WL 3089387, at *3 (citation omitted).  In addition, one case emphasizes that the Connecticut Supreme Court has "recognized the propriety of awarding damages for emotional distress for fraudulent misrepresentations in *Kilduff v. Adams, Inc.,* 219 Conn. 314 (1991)."  *Id.* at 4.  In *Kilduff*, the Connecticut Supreme Court recognized that "[a]lthough several courts have denied recovery for mental distress in a fraud action on the ground that damages in such an action are solely intended to compensate the plaintiff for pecuniary loss ... we concur with those jurisdictions that allow the recovery of emotional damages that are the natural and proximate result of fraud." *Kilduff*, 219 Conn. at 324.  This Court will therefore not preclude Ridgeway from seeking emotional damages on his negligent misrepresentation claim in the absence of any authority interpreting Connecticut law directly holding that emotional damages are not recoverable on a negligent misrepresentation claim and in light of the Connecticut Supreme Court's conclusion that emotional damages are recoverable on a claim for fraudulent misrepresentation.

Lastly, RBS argues that Ridgeway cannot have any reliance damages as a matter of law because he was employed at-will and because he could not return to work in March and April.  As discussed above, Ridgeway may establish detrimental reliance and be awarded future wages despite the fact that he was employed at will and there is a dispute of fact as to whether Ridgeway could have

returned to work in March or April.  Therefore, there are triable issues of fact with respect to his "reliance" damages.

<u>Conclusion</u>

Based upon the above reasoning, the Court denies RBS's motion to withdraw two judicial admissions, denies in part and grants in part RBS's motion for summary judgment and denies Ridgeway's motion for summary judgment. The Court grants summary judgment in favor of RBS on Ridgeway's FMLA retaliation claim.  Ridgeway's FMLA interference, promissory estoppel and negligent misrepresentation claims remain extant for trial.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: May 13, 2013